IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **FORD MOTOR COMPANY**, a Delaware corporation, and **FORD GLOBAL TECHNOLOGIES, LLC**, a Delaware limited liability company,<br><br>         Plaintiffs,<br>   v.<br><br>**LAUNCH TECH CO. LTD.**, a Chinese corporation, and **LAUNCH TECH (USA), INC.**, a California corporation,<br><br>         Defendants. | Civil Action No. 2:17-cv-12906-NGE-DRG<br><br>Honorable Nancy G. Edmunds |

GREGORY D. PHILLIPS (P80801)
JARED L. CHERRY (P80800)
PHILLIPS RYTHER &
WINCHESTER
600 East 124 South
Salt Lake City, Utah 84102
Tel: (801) 935-4935
Fax: (801) 935-4936
Attorneys for Plaintiff

## <u>FORD'S MOTION FOR PRELIMINARY INJUNCTION</u>

Ford Motor Company ("FMC") and Ford Global Technologies, LLC

("FGTL") (collectively "Ford") file this motion for a preliminary injunction

preventing Launch Tech Co. Ltd. ("Launch China") and Launch Tech (USA), Inc.

("Launch USA") (collectively "Launch") from continuing their ongoing misappropriation of Ford's trademarks, copyrights, and trade secrets, and enjoining Launch from producing, marketing, distributing, or selling products containing or incorporating Ford's intellectual property. This motion is supported by the accompanying memorandum and the declarations of Kevin Brady ("Brady Dec.") and Jared L. Cherry ("Cherry Dec.").

## COMPLIANCE WITH LR 7.1

Counsel for Ford has conferred with counsel for Launch regarding the relief sought in this motion on multiple occasions. More specifically, during an in-person meeting at the office of counsel for Launch China on November 14, 2017, counsel for Ford identified the factual basis on which present motion relies related to Ford's claims of misappropriation trade secrets and copyright infringement.

Ford also addressed the factual and legal basis for the present motion at a settlement conference before Judge Majzoub held on November 28, 2017. Ford communicated that if the dispute could not be resolved, and if Launch would not cease from its violations of Ford's intellectual property rights, Ford would file the present motion for preliminary injunction.

Finally, counsel for Ford sent an email message to counsel for Launch on December 13, 2017, and requested a conference under LR 7.1. Counsel for Launch USA and Launch China each belatedly responded to the email and

indicated that they were occupied with other matters, that they were unable to

confer, and asserting that counsel for Ford failed to provide sufficient notice of its

request for a conference under LR 7.1.

> Gregory D. Phillips
> Jared L. Cherry
> PHILLIPS, RYTHER & WINCHESTER
>
> By:    /s/ Gregory D. Phillips
>           Gregory D. Phillips
>           Attorneys for Plaintiffs
>           Ford Motor Company and
>           Ford Global Technologies LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2017, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to counsel of record.

By:    /s/ Jared L. Cherry

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **FORD MOTOR COMPANY**, a Delaware corporation, and **FORD GLOBAL TECHNOLOGIES, LLC**, a Delaware limited liability company, | Civil Action No. 2:17-cv-12906-NGE-DRG |
| Plaintiffs, | Honorable Nancy G. Edmunds |
| v. | |
| **LAUNCH TECH CO. LTD.**, a Chinese corporation, and **LAUNCH TECH (USA), INC.**, a California corporation, | |
| Defendants. | |

GREGORY D. PHILLIPS (P80801)
JARED L. CHERRY (P80800)
PHILLIPS RYTHER &
WINCHESTER
600 East 124 South
Salt Lake City, Utah 84102
Tel: (801) 935-4935
Fax: (801) 935-4936
Attorneys for Plaintiff

**MEMORANDUM IN SUPPORT OF
<u>FORD'S MOTION FOR PRELIMINARY INJUNCTION</u>**

## <u>Statement of Issues</u>

1.      Whether Plaintiffs are entitled to a preliminary injunction precluding use of Ford's world-famous trademarks where: (A) Launch USA agreed in writing to refrain from future unauthorized use of Ford's trademarks, (B) promotional materials posted to the Internet by Launch USA include the FORD OVAL® design trademark, (C) the iDiag App distributed by Launch China through Apple's iTunes Store includes a version of the FORD OVAL® design trademark, and (D) at least three specific Launch products incorporate electronic images of Ford's design trademarks.

2.      Whether Plaintiffs are entitled to a preliminary injunction enjoining further dilution of Ford's world-famous trademarks where: (A) the fame and distinctiveness of the marks at issue is established by published opinions from this Court and others, (B) there can be no dispute that Launch's use of Ford's marks on, and to promote, Launch's diagnostic tools constitutes use of the marks in commerce, and (C) Supreme Court precedent holds that when the "junior and senior marks are identical," use of the junior mark presents an "obvious case" of dilution.

3.      Whether Plaintiffs are entitled to a preliminary injunction enjoining Launch's use of Ford's trade secrets where: (A) Launch's data files reference by

ii

name 25 separate files contained in Ford's IDS Software and incorporate the content of those files, (B) Launch's data files incorporate data that Ford does not make available to diagnostic tool manufacturers, (C) programmer comments show that Launch was extracting data from a version of Ford's IDS Software that was released *after* Launch had complained that Autel, a Launch competitor, was reaping unfair advantages in the market by extracting data from Ford's IDS Software and *after* Launch was named as a defendant in a prior suit Ford brought against Autel, alleging claims that are virtually identical to the claims Ford now asserts against Launch (the "Autel Litigation"), and, (D) Launch's source code utilizes information disclosed by Ford in the Autel litigation to better hide Launch's acts of infringement.

4.    Whether Plaintiffs are entitled to a preliminary injunction enjoining Launch's ongoing infringement or use of Ford's copyrights where Launch's data files incorporate (A) fictitious data from Ford's CALID Copyright Registration intentionally planted by Ford in its software that does not correspond to any Ford vehicles, (B) highly idiosyncratic text from Ford's MNEMONICS Copyright Registration, and (C) where Launch's products display text that corresponds precisely to Ford's MNEMONICS Copyright Registration, as shown in numerous examples in Ford's Complaint.

5.    Whether Plaintiffs are entitled to a preliminary injunction enjoining Launch from producing, marketing, distributing, and selling all products misappropriating Ford's intellectual property in clear violation of U.S. law.

## **Controlling Authority**

*Audi AG v. D'Amato,* 469 F. 3d 534 (6th Cir. 2006)

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340 (1991)

*Ford Motor Co. v. Lloyd Design,* 22 F. App'x. 464, 467, 2001 WL 1356137, at *4
      (6th Cir. 2001)

*Lexmark Intern. v. Static Control Components,* 387 F.3d 522 (6th Cir. 2004)

# **Table of Contents**

Statement of Issues.................................................................... ii

Controlling Authority...................................................................v

Table of Contents .................................................................... vi

Table of Authorities ................................................................ vii

Table of Exhibits........................................................................ xi

Introduction and Factual Background........................................1

Argument.....................................................................................4

    I.    Ford Has a Strong Likelihood of Success on the Merits under
Multiple Causes of Action, each of which is an Independently Sufficient Basis
for Entry of an Injunction. ........................................................5

        a.    Ford has a Strong Likelihood of Success on its Trademark
Infringement and False Designation of Origin Claims....................................5

        b.    Ford has a Strong Likelihood of Success on its Dilution Claims...10

        c.    Ford has a Strong Likelihood of Success on its Misappropriation of
Trade Secrets Claims. ................................................................11

        d.    Ford has a Strong Likelihood of Success on the Merits of its
Claims for Copyright Infringement. ..............................................17

    II.    Ford Will Suffer Irreparable Harm Without Injunctive Relief..........21

    III.    The Balance of Hardship Weighs in Favor of Injunctive Relief....23

    IV.    The Public Interest is Served by Granting Injunctive Relief..........24

    Conclusion ................................................................................25

## <u>Table of Authorities</u>

**Cases**

*Aetna, Inc. v. Flugel*, 2008 Conn. Super. LEXIS 326 (Conn. 2008)......................13

*Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240 (3d Cir. 1983)25

*Audi AG v. D'Amato*, 381 F. Supp.2d 644 (E.D. Mich. 2005)...............................10

*Audi AG v. D'Amato*, 469 F.3d 534 (6th Cir. 2006)......................................... 10, 23

*Blockbuster Entm't Grp. v. Laylco, Inc.*, 869 F. Supp. 505 (E.D. Mich. 1994)......24

*Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F. 3d 470 (6th Cir. 2007) .....23

*City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427 (6th Cir. 2014).....4

*Collezione Europa U.S.A., Inc. v. Hillsdale House,* 243 F. Supp.2d 444 (M.D.N.C. 2003) ......................................................................................................................18

*Dive N Surf, Inc. v. Anselowitz*, 834 F. Supp. 379 (M.D. Fla. 1993) .......................6

*Dura Global Techs., Inc. v. Magna Donnelly Corp.*, 662 F. Supp.2d 855 (E.D. Mich. 2009).........................................................................................................12

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) ........................................22

*Eckes v. Card Prices Update,* 736 F.2d 859 (2d Cir. 1984)....................................19

*Esercizio v. Roberts*, 944 F.2d 1235 (6th Cir. 1991) ................................................5

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340 (1991) ...........................17

*Ford Motor Co. v. Heritage Mgmt. Grp.*, 911 F. Supp.2d 616 (E.D. Tenn. 2012).11

*Ford Motor Co. v. Lloyd Design,* 184 F. Supp.2d 665 (E.D. Mich. 2002) ..............8

*Ford Motor Co. v. Lloyd Design*, 22 F. App'x. 464 (6th Cir. 2001) ........................6

*Frisch's Rest., Inc. v. Shoney's Inc.,* 759 F.2d 1261 (6th Cir. 1985)........................9

*Frisch's Rests. Inc v. Elby's Big Boy*, 670 F.2d 642 (6th Cir. 1982).......................10

*General Motors v. Autovation Techs.*, 317 F. Supp.2d 756  (E.D. Mich. 2004).......6

*General Motors v. E-Publ'ns,* 2001 WL 1798648 (E.D. Mich. 2001) ....................10

*Hayden v. Chalafant Press*, 281 F.2d 543 (9th Cir. 1960) .....................................19

*In re DeLorean Motor Co.*, 755 F.2d 1223 (6th Cir. 1992).......................................4

*In re Under Seal*, 749 F.3d 276 (4th Cir. 2014).....................................................13

*Lexmark Int'l, Inc. v. Static Control Components,* 387 F.3d 522 (6th Cir. 2004). 18,
    22

*M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421 (4th Cir. 1986)...............................19

*Microsoft Corp. v. McGee*, 490 F. Supp.2d 874 (S.D. Ohio 2007) ........................24

*Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp.3d 915 (N.D. Ill.
    2016) ................................................................................................................11

*Moseley v. V. Secret Catalogue, Inc.,* 537 U.S. 418 (2003) ...................................11

*National Bus. Forms & Printing v. Ford Motor Co.,* 671 F.3d 526 (5th Cir. 2012).8

*Porsche Cars North America, Inc. v. Manny's Porshop, Inc.*, 972 F. Supp. 1128
    (N.D. Ill. 1997)...................................................................................................2

*Repp v. Webber*, 132 F.3d 882 (2d Cir. 1997).......................................................19

*Standard & Poors Corp. v. Commodity Exch., Inc.*, 683 F.2d 704 (2d Cir. 1982) .21

*State of Idaho Potato Comm'n v. G&T Terminal Pkg, Inc.*, 425 F.3d 708 (9th Cir.

   2005) ..................................................................................................22

*Superior Consulting Co. v. Walling*, 851 F. Supp. 839 (E.D. Mich. 1994)............21

*Telerep Caribe, Inc. v. Zambrano*, 146 F. Supp.2d 134 (D. PR 2001) ..................24

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992).....................................5

*Utilase, Inc. v. Williamson*, 1999 WL 717969 (6th Cir. Sept. 10, 1999) ...............11

*Varitronics Sys. v. Merlin Equip.*, 682 F. Supp. 1203 (S.D. Fla. 1988) ...................2

*Virtual Studios, Inc. v. Beaulieu Grp., LLC*, 987 F. Supp.2d 769 (E.D. Tenn. 2013)

   ..............................................................................................................22

*Warren Publ'g v. Microdos Data*, 52 F.3d 950 (11th Cir. 1995)...........................19

*Wynn Oil Co. v. American Way Svc. Corp.*, 943 F.2d 595 (6th Cir.1991).............21

*Yankee Candle v. Bridgewater Candle,* 259 F.3d 25 (1st Cir. 2001) .....................18

**Statutes**

15 U.S.C. § 1114 ..................................................................................................5, 7

18 U.S.C. § 1836(b)(3)(A) .....................................................................................11

18 U.S.C. § 1839(3)(B) ..................................................................................... 12, 15

MCL § 445.1901 ............................................................................................. 11, 15

MCL § 445.1902 ....................................................................................................12

**Other Authorities**

Congressional Report 114-529, Defense of Trade Secrets Act of 2016..................24

**Treatises**

6 J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION .........2, 22

### Table of Exhibits

A. Cease and desist letter signed by Launch on January 13, 2012.

B. Registration Certificates for Trademark Registration Nos. 3,657,597, 3,046,211, 2,034,370, and 4,766,840.

C. Selected pages from Ford's 2016 Annual Report.

D. End User License Agreement governing use of IDS from June 26, 2014, through the present.

E. Order receipts for IDS Software purchased by Launch.

F. Letter to D. Kunze from J. Cherry, dated November 15, 2017.

G. Certificate of Registration for copyrighted work titled CALID_VIDQID_REC.

H. Certificate of Registration for copyrighted work titled MNEMONICS_ENG.

I. Email Messages from I. Chen and J. Jiang, dated October 18-19, 2013.

J. Screen Capture from YouTube.

K. Purchase History for download of "iDiag" App from Apple iTunes Store.

L. Launch X-431 Sell Sheet, available at: http://launchtechusa.com/x-431pro/.

M. Forbes List of The World's Most Valuable Brands.

N. Comparison of Launch Screen Captures and MNEMONICS_ENG text.

## **Introduction and Factual Background**

The present case involves blatant infringement of Ford's world-famous trademarks after Launch agreed in writing to end its, undeniable pirating of Ford's Integrated Diagnostic Software ("IDS"), misappropriation of Ford trade secrets embodied in IDS, and duplication of Ford's copyrights.  In 2015, Launch and Innova, manufacturers of automotive diagnostic equipment, notified Ford that a competitor, Autel, had misappropriated Ford's intellectual property.  They complained that such actions provided Autel an unfair advantage in the diagnostic tool market and assisted Ford in proving Autel's infringement.  Ford filed suit against Autel (the "Autel Litigation"), captioned *Ford Motor Co. v. Autel US Inc.*, Civil No. 4:14-cv-1376, and eventually settled on terms favorable to Ford.

Ford recently learned that while Launch was complaining about Autel, Launch was not only engaging in the same unlawful conduct, but also was using information disclosed by Ford in the Autel Litigation to better hide its own piracy. Upon learning of Launch's piracy, Ford sent a letter to Launch's counsel on July 17, 2017, seeking both to confirm the information that Ford had received and settle to this dispute.  Cherry Dec. at ¶ 6.  Despite Ford's diligent attempts to resolve the

1

matter without litigation, Ford was forced to file the present action because Launch

failed to produce information required by Ford.[1]  Cherry Dec. at ¶ 7.

Launch permitted Ford's counsel to review source code and data files on

November 14, 2017, in Los Angeles (the "Source Code Review"), but refused to

allow Ford to make copies of any materials.  Cherry Dec. at ¶¶ 8-9.  During the

review, Ford identified evidence supporting the claims asserted in the Complaint.

Specifically, Ford's counsel found: (1) precise references to 25 files contained in

Ford's IDS Software ("IDS") preceding data copied from those files,[2] (2) fictitious

data records intentionally planted by Ford and then copied by Launch from IDS,[3]

(3) highly idiosyncratic expressions inapplicable to Launch's product,[4] (4)

programmer comments referring to the specific versions of IDS[5] from which

---

[1] Any suggestion by Launch that Ford did not act diligently would be misplaced.
"Time spent in attempting to resolve a dispute is not counted towards laches
because '[s]ettlement of legal disputes is a highly favored course of conduct for
which a party should be rewarded, not penalized.'"  6 J. MCCARTHY, MCCARTHY ON
TRADEMARKS AND UNFAIR COMPETITION § 31:15 (4th ed. 2012 update) (quoting
*Varitronics Sys. v. Merlin Equip.*, 682 F. Supp. 1203, 1209 (S.D. Fla. 1988))
(hereafter "MCCARTHY"); *see also Porsche Cars North America, Inc. v. Manny's
Porshop, Inc.*, 972 F. Supp. 1128, 1132-33 (N.D. Ill. 1997) (rejecting laches
argument in granting preliminary injunction after Porsche attempted resolution
through demand letters and settlement negotiations over ten years, noting "strong
public policy in favor of voluntary settlements," and holding trademark holder
"should not be punished for pursuing a non-litigious course of action").
[2] Cherry Dec. at ¶ 14; Brady Dec. at ¶ 5.
[3] Cherry Dec. at ¶ 15; Brady Dec. at ¶ 13.
[4] Cherry Dec. at ¶ 19-20.
[5] Cherry Dec. at ¶ 21.

Launch had extracted data, and (5) code that searches for and discards information associated with the terms "TEST" and "DUMMY"[6]—terms, as Ford disclosed in the Autel Litigation, associated with fictitious data intentionally planted by Ford in IDS. *See* Autel Litigation, Dkt. 28, Pg ID 439 (heading referring to "Test" and "Dummy" entries in CALID). These findings are proof that Launch misappropriated Ford's trade secrets and copyrighted materials from IDS and incorporated those materials into Launch's products.

Following the Source Code Review, Ford delivered a written request to Launch to provide copies of the data files copied from IDS and 21 screen captures (the "Screen Captures") created during the review. Cherry Dec. at ¶ 11; Exhibit F. Launch has refused to voluntarily provide this information, necessitating Ford's Motion for Expedited Discovery and Order Compelling Production, filed contemporaneously herewith.

Launch is also violating its written agreement to stop using Ford's world-famous design trademarks to promote its products. In a demand letter of January 3, 2012, Ford notified Launch USA of Ford's objection to Launch's use of Ford design trademarks or logos on Launch's website and products. In response, Launch USA agreed to "refrain from using Ford trademarks on any and all of [its] printed or electronic advertising and promotional materials in the future" (the

---

[6] Cherry Dec. at ¶ 22.

"Letter Agreement"). Exhibit A. In violation of the Letter Agreement, Launch USA posted multiple videos to YouTube promoting Launch products and utilizing the FORD OVAL®. *See* Exhibit J (showing use of FORD OVAL®); Cherry Dec. at ¶ 30. Launch has also used Ford's trademarks in a variety of other unauthorized ways, including distributing products that bear images Ford's trademarks. Brady Dec. at ¶¶ 19-21.

## <u>Argument</u>

Federal Rule of Civil Procedure 65(a) authorizes a Court to issue a preliminary injunction. A Court must consider four factors when deciding whether to issue injunctive relief:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014). These are "factors to be balanced, not prerequisites which must be met." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1992). Each of the four factors in this case demonstrates that a preliminary injunction is warranted.

4

I.  **Ford Has a Strong Likelihood of Success on the Merits under Multiple Causes of Action, each of which is an Independently Sufficient Basis for Entry of an Injunction.**

a.  **Ford has a Strong Likelihood of Success on its Trademark Infringement and False Designation of Origin Claims.**

Likelihood of confusion is the central element of claims for trademark infringement and false designation of origin.[7]  Ford is likely to prevail on its claims of trademark infringement and false designation under either of two alternative theories, namely, that (1) Launch's use of an identical replica of the FORD OVAL® gives rise to a presumption of confusion, and (2) application of the traditional factors for determining likelihood of confusion to the undisputed facts shows that confusion is inevitable.

As the Sixth Circuit has recognized, there "is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Esercizio v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991). Accordingly, confusion is presumed where the defendant misappropriates the

---

[7] 15 U.S.C. § 1114; *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768-69 (1992) (holding likelihood of confusion is critical element of federal trademark infringement claim).  The analysis of Ford's claims for false designation of origin is subject to the identical standard, and accordingly, provides an alternative ground for the relief sought in this motion.  *Two Pesos*, 505 U.S. at 780.

plaintiff's precise trademarks on competing goods.[8]  Launch has used Ford's

trademarks in its promotional materials to advertise goods that compete directly

with Ford's own, diagnostic products that bear identical marks.  For example,

Launch USA's video for the ScanPad 071, which was posted to Launch USA's

website, includes the FORD OVAL®, as shown below.  Cherry Dec. at ¶ 30.



Image 1

---

[8] *See, e.g., Ford Motor Co. v. Lloyd Design*, 22 F. App'x. 464, 467 (6th Cir. 2001)
(holding "likelihood of confusion is presumed when a defendant intentionally
copies a trademark design 'with the intent to derive a benefit from the reputation of
another'"); *General Motors v. Autovation Techs.*, 317 F. Supp.2d 756, 761 (E.D.
Mich. 2004) (presuming confusion when manufacturer's goods bore precise
replicas of GM marks); *Dive N Surf, Inc. v. Anselowitz*, 834 F. Supp. 379, 382
(M.D. Fla. 1993) (applying presumption and granting summary judgment when
marks were "substantially similar as to both design and use").

In another example, shown in Image 2, Launch included the FORD OVAL®
in its iDiag Product.[9] Also shown for purposes of comparison is U.S. Trademark
Reg. No. 3,657,597, which specifically pertains to "automobile repair and
maintenance services."

| Image 2 | |
|---|---|
| Launch's iDiag Product | Ford's Trademark Reg. No. 3,657,597 |
|  | Registered in Int.'l Class 037 for: "Automobile repair and maintenance services." |

---

[9] Launch's use of a "fish eye" effect does not affect this analysis.  The Lanham Act
specifically applies to any "colorable imitation of a registered mark . . . ."  15
U.S.C. § 1114(1)(a).

### i.      Ford is Likely to Prevail Under the Traditional Likelihood of Confusion Factors.

Although application of the traditional factors is unnecessary, the analysis nevertheless demonstrates that Ford is likely to succeed on the merits even without the presumption of confusion.

*1. Ford's Marks are Strong.* The worldwide fame of FORD® and FORD OVAL® has been specifically recognized in judicial opinions and by independent assessments.[10] Indeed, FORD® is recognized as one of the most valuable brands in the world. Exhibit M (ranking Ford's brand as 35th most valuable brand in world with value of $14.1 billion). Between 2014 and 2016, Ford expended $12.9 billion dollars advertising FORD products. Exhibit C.

*2. The Parties' Goods Are Related.* Both Ford and Launch offer diagnostic products to repair Ford vehicles. FORD OVAL® and FORD® are registered for use in connection with "automobile repair and maintenance services." Exhibit B.

*3. Launch Uses Ford's Identical Marks.* Launch uses precise counterfeits of Ford's world-famous marks, as illustrated above.

---

[10] *See, e.g., Ford Motor Co. v. Lloyd Design,* 184 F. Supp.2d 665, 679 (E.D. Mich. 2002) (finding FORD® famous for purposes of dilution claim); *National Bus. Forms & Printing v. Ford Motor Co.,* 671 F.3d 526, 536 (5th Cir. 2012) ("the Ford Oval and the Ford Script logo are both famous marks").

**4. Evidence of Actual Confusion is not Required.**  Although not required,[11] Ford expects such evidence exists and will be identified in discovery.

**5. The Products are Sold through Similar Channels and to Similar Customers.**  The target market for both parties' products includes repairers of Ford vehicles, and the parties market their products in similar channels, including industry trade shows and through the Internet.

**6. Users of Launch's Products Associate Ford's Trademarks with Enhanced Functionality.**  Launch markets its products as having "next generation software" that provides "OE-level access" for Ford vehicles.  Exhibit L.  Launch's claims and use of Ford's trademarks, along with those of other Original Equipment ("OE") manufacturers, causes consumers to erroneously believe that Launch is affiliated with these OE manufacturers and that such affiliation enables Launch to offer enhanced functionality.  Consumers rely on the presence of Ford's trademarks as indicators of source and quality.  Consumers will not look beyond the presence of Ford's trademarks to determine whether goods are authorized before associating the product with Ford.

**7. Launch Intends to Profit from Ford's Goodwill.**  Launch's intent is established by Launch USA's agreement to discontinue use of Ford's design trademarks in the Letter Agreement.  Exhibit A.  When an infringer intends to

---

[11] *Frisch's Rest., Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1266 (6th Cir. 1985).

profit by adopting the plaintiff's mark, this factor is given considerable weight.[12]

Courts consistently have held, moreover, that "use of another's style or script

constitutes presumptive evidence of deliberate copying and an intent to confuse."[13]

**8. Likelihood of Expansion of Product Lines.** Analysis of this factor is

unnecessary as the parties are already in direct competition in the same market.

### b.    Ford has a Strong Likelihood of Success on its Dilution Claims.

To prevail, Ford must show that (1) its marks are famous, (2) its marks are

distinctive, (3) the defendant used the marks in commerce, (4) the use began after

the marks became famous, and (5) the use caused dilution of the distinctive quality

of the marks. *Audi AG v. D'Amato*, 469 F.3d 534, 547 (6th Cir. 2006).

Elements (1), (2), and (4) are established by published opinions recognizing

the fame and distinctiveness of Ford's marks prior to Launch's introduction of

products here at issue.[14] Respecting element (3), Autel's use of Ford's marks on,

and to promote, Autel's diagnostic tools indisputably constitutes use in commerce.

---

[12] The "intent of defendants in adopting (their mark) is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of (the plaintiff,) that fact alone may be sufficient to justify the inference that there is confusing similarity." *Frisch's Rests. Inc v. Elby's Big Boy*, 670 F.2d 642, 648 (6th Cir. 1982), *cert. denied*, 459 U.S. 916 (1982) (internal citation omitted).

[13] *General Motors v. E-Publ'ns,* 2001 WL 1798648, at *2 (E.D. Mich. 2001) (entering judgment when infringer displayed marks in distinctive script); *Audi AG v. D'Amato*, 381 F. Supp.2d 644, 661 (E.D. Mich. 2005) (confusion established by display of Audi's logo), *aff'd*, 469 F.3d 534 (6th Cir. 2006).

[14] *See* fn. 10, *supra.*

Element (5) is established as a matter of law when identical marks are used on similar goods.[15]

### c. Ford has a Strong Likelihood of Success on its Misappropriation of Trade Secrets Claims.

Under the Defense of Trade Secrets Act ("DTSA") and the Michigan Uniform Trade Secrets Act ("MUTSA"), this Court is empowered to grant an injunction to prevent any "actual or threatened misappropriation." 18 U.S.C. § 1836(b)(3)(A), MCL § 445.1901, *et seq.* Under the DTSA, Ford must show "misappropriation" of its trade secret, which is "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret."[16] Under Michigan law, Ford must prove: "1) the existence of a trade secret; 2) its acquisition in confidence; and 3) the defendant's unauthorized use of it."[17]

---

[15] *Moseley v. V. Secret Catalogue, Inc.,* 537 U.S. 418, 434 (2003) ("[D]irect evidence of dilution such as consumer surveys will not be necessary if actual dilution can reliably be proved through circumstantial evidence—the obvious case is one where the junior and senior marks are identical"); *Ford Motor Co. v. Heritage Mgmt. Grp.*, 911 F. Supp.2d 616, 629-30 (E.D. Tenn. 2012) (same).

[16] *Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp.3d 915, 920 (N.D. Ill. 2016).

[17] *Utilase, Inc. v. Williamson*, 1999 WL 717969, at *6 (6th Cir. Sept. 10, 1999).

In determining whether information constitutes a trade secret under MUTSA, Michigan courts consider the following factors:

> (1) extent to which information is known outside of owner's business, (2) extent to which information is known by employees and others involved in business, (3) extent of measures taken to guard secrecy of information, (4) value of information to owners and competitors, (5) amount of effort and money expended in developing information, and (6) ease or difficulty with which information could be properly acquired or duplicated by other.[18]

Launch's misappropriation is established by the fact that Launch's data files refer by name to the Ford trade secrets at issue.  Although Launch refused multiple requests to allow Ford to perform an exhaustive comparison, there can be no doubt what such a comparison will show.  Moreover, during the Source Code Review, Ford's counsel specifically illustrated to counsel for Launch China the identical file names, and specific examples of fictitious Ford data copied from Ford's IDS Software.  Cherry Dec. at ¶ 23.  Launch's steadfast refusal to permit an exhaustive comparison can only be deemed as an admission agrees with Ford's position.

> ### i.   Ford has Taken Reasonable Steps to Maintain the Secrecy of the Data Files.

Both the DTSA and MUTSA require implementation of measures "reasonable" to maintain the secrecy of a trade secret.[19]  Ford utilizes at least two separate techniques for maintaining the secrecy of the FF Data files included in the

---

[18] *Dura Global Techs., Inc. v. Magna Donnelly Corp.*, 662 F. Supp.2d 855, 859 (E.D. Mich. 2009) (internal citation omitted).
[19] *See* 18 U.S.C. § 1839 (3)(A); Mich. Comp. Laws § 445.1902.

specific versions of IDS (i.e., 100 and 104) referenced in programmer comments in Launch's source code.  First, Ford utilizes SSL encryption to prevent unauthorized access to the FF Data files in IDS.  Brady Dec. at ¶ 9.  SSL encryption is widely recognized as the "industry standard" for data encryption.[20]

Second, the FF Data files are encoded in a proprietary flat file database format.  Brady Dec. at ¶ 8.  Ford does not disclose this format, and knowledge of the structure of the flat file is necessary to interpret the data.  *Id*. The format obfuscated the information as well as the relationships between the data, and acted to prevent unauthorized use of the data.  *Id*.

The trade secrets included in IDS Software are available to only a small group of Ford engineers and a single external supplier.  Brady Dec. at ¶ 6.  The data is maintained in strict secrecy, and access to the data is restricted to employees that have a need for such access.  *Id.* at ¶ 7.  Apart from the external supplier and a single licensee, which pays a very significant license fee and who utilizes data encryption technologies mandated by Ford to prevent unauthorized use, the data in question is not disclosed to any other third parties.  *Id*.

---

[20] *See, e.g.*, *In re Under Seal*, 749 F.3d 276, 280 (4th Cir. 2014) (recognizing SSL is "an industry-standard protocol" used by "many online companies"); *Aetna, Inc. v. Flugel*, 2008 Conn. Super. LEXIS 326, *14 (Conn. 2008) (noting "Aetna also goes to great lengths to protect its trade secrets" including use of "encryption to limit access to confidential information").

> **ii.     Launch's Acquisition of IDS was in Furtherance of Launch's Theft of Ford's Trade Secrets.**

Launch acquired and activated multiple copies of IDS.  Exhibit E.  The acquisition of IDS in the United States is an act in furtherance of Launch's plan to extract Ford's trade secrets from IDS.  Even after receiving a demand letter objecting to such extraction, Launch acquired a new subscription.  Exhibit E, page 1 (showing order date of August 14, 2017); Cherry Dec. at ¶ 6 (attesting demand letter sent on July 17, 2017).  In connection with this *post de facto* acquisition, Launch attempted to conceal its identity by changing the contact information associated with Launch's account, as shown in Table 1.

| Table 1 | | |
|---|---|---|
| | Prior Value | New Value |
| Contact Name | Shi Shi | Xianglong Zuo |
| Address | 1820 S Milliken Ave Ontario, CA 91761 United States | 1757 E Flora St. Ontario, CA 91764 United States |
| Phone | 909-606-1815 | 91-777-54299 |
| Email | sam.shi@launchtechusa.com | Sandyshi1820@gmail.com |

These changes demonstrate Launch's awareness of Ford's objections and its attempt to conceal its misconduct so that it could continue to extract Ford's trade secrets and copyrights from IDS.

On information and belief, Ford asserts that Launch offers a bonus of 50,000 RMB to the first employee that successfully extracts data from a genuine OEM diagnostic system, and that the employee who extracted data from Ford's IDS

Software is Yanqing Xiong.  Ford is concurrently seeking leave to conduct discovery to verify this information.

### iii.  Launch and Other Competitors Have Recognized the Value of the Data Files.

When Launch and Innova approached Ford regarding Autel, they specifically complained that Autel's misappropriation of Ford's trade secrets provided Autel an unfair advantage.  More specifically, Ieon Chen stated of Autel's conduct: "[i]f this kind of _unfair behavior_ is not contained, it will eventually ruin our business system as we know it."  Exhibit I (emphasis added).  James Jiang, Launch China's Vice President, responded to Mr. Chen's message noting that he would work to "provide some new files" showing Autel's infringement by "the end of this month."  To the extent that Autel's use of the files at issue constituted "unfair behavior," the same conclusion must apply in this case.

Even without Mr. Jiang's admission, Ford's FF Data is information that "derives independent economic value, actual or potential, from not being generally known" and "not being readily ascertainable through proper means."  18 U.S.C. § 1839(3)(B); Mich. Comp. Laws § 445.1902 (same).  Ford invested $73,384,858 from 2011-2016 in connection with research and development of Ford's diagnostic system, including the IDS Software and related hardware.  Brady Dec. at ¶ 22.  As a result of this investment, Ford has sold 262,550 annual licenses, resulting in profits of $133,862,148 from 2011-2016.  Brady Dec. at ¶ 23.

15

### iv.    Ford's Trade Secrets are Utilized by and Incorporated in Launch's Products.

The files FORD_06.XML – FORD_13.XML produced during the Source Code Review specifically refer to 25 separate data files in IDS Software.  Cherry Dec. at ¶ 14.  These files are included in Ford's X-431 Pro, X-431 V, and X-431 GDS products.  Brady Dec. at ¶ 16.  The presence of the names of these twenty-five (25) files from Ford's IDS Software in Launch's own data files, together with specific references to versions 100 and 104 of Ford's IDS Software,[21] cannot be explained as mere coincidence.

Although Launch's refusal to provide the files FORD_06.XML – FORD_13.XML prevents Ford from providing an in-depth comparison in support of this motion, there can be no doubt regarding the source of the data and Launch's copying of that data due to the presence of fictitious information from Ford's IDS software in Launch's data file.  Once Ford has access to Launch's data files, Ford intends to perform a detailed comparison and provide the results to the Court.

### v.    Launch Relied on "Improper Means" to Access Ford's Trade Secrets.

Launch only obtained access to the trade secrets and copyrighted software through a "misrepresentation" regarding Launch's acceptance of the end-user license agreement ("EULA") governing the use of IDS Software.  The EULA

---

[21] Cherry Dec. at ¶ 18.

states: "YOU AGREE TO BE BOUND BY THE TERMS OF THIS EULA BY INSTALLING, COPYING, OR OTHERWISE USING THE PRODUCT.  IF YOU DO NOT AGREE, DO NOT INSTALL OR USE THE PRODUCT."  Exhibit D. In addition, end users are required to affirmatively indicate acceptance of the terms of the EULA as part of the installation process and have been required to do so at all times relevant to Launch's use of IDS Software.

The EULA prohibits "reverse engineering, decompilation, and disassembly." Exhibit D.  Despite that prohibition and Launch's acceptance of the EULA terms, all available evidence demonstrates that Launch "disassembled" IDS Software and incorporated the constituent pieces (*i.e.*, the 25 files mentioned by name in the data files produced during the Source Code Review) into Launch's products.

### d. Ford has a Strong Likelihood of Success on the Merits of its Claims for Copyright Infringement.

To prove copyright infringement, Ford must show: (1) ownership of a valid copyright and (2) that the defendant copied protected elements of the work.  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991).  "The first prong tests the originality and non-functionality of the work, both of which are presumptively established by the copyright registration.  The second prong tests whether any copying occurred (a factual matter) and whether the portions of the

work copied were entitled to copyright protection (a legal matter)." *Lexmark Int'l, Inc. v. Static Control Components,* 387 F.3d 522, 534 (6th Cir. 2004).[22]

"Infringement of a copyright can be shown in two ways, either by direct evidence of copying, or by proof that Defendants had access to the copyrighted work and that the copyrighted work and the infringing work are 'substantially similar.'" *Wilcom Pty. Ltd v. Endless Visions,* 128 F. Supp.2d 1027, 1031 (E.D. Mich. 1998), *aff'd*, 229 F.3d 1155 (6th Cir. 2000).

### i.   Ford has a Strong Likelihood of Success on the Merits of its Claims of Infringement of the CALID Registration.

There is little dispute that Launch had access to the CALID and MNEMONICS registrations because both works are included in IDS Software. Brady Dec. at ¶ 5. Launch acquired and activated multiple versions of IDS Software. Exhibit E. Moreover, access and copying are evidenced by the presence of fictitious data and highly idiosyncratic text in the files produced during the Source Code Review. More specifically, the file FORD_02.XML bears "striking similarity" to the CALID Registration due to the inclusion of fictitious data. "[W]here there are striking similarities probative of copying, proof of access may

---

[22] *See also Yankee Candle v. Bridgewater Candle,* 259 F.3d 25, 34 n.5 (1st Cir. 2001) (holding copyrightability is matter of law); *Collezione Europa U.S.A., Inc. v. Hillsdale House,* 243 F. Supp.2d 444, 451-52 (M.D.N.C. 2003) (holding determinations of copyrightability are "appropriate for summary judgment").

18

be inferred." *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997). Duplication of "common errors" and the presence of fictitious entries are among "the most persuasive proofs of copying, second only to direct evidence of copying." *Hayden v. Chalafant Press*, 281 F.2d 543, 548 (9th Cir. 1960).[23]

Apart from copying, there is no other explanation for the presence of Ford's fictitious data in Launch's products. The similarity between CALID and the FORD_02.XML file "is so striking, there is no possibility of independent creation. Therefore, copying can be inferred . . . ." *Wilcom*, 128 F. Supp.2d at 1032. *Wilcom's* rationale is determinative of this case. The creators of Ford's IDS Software selected which materials to include and which materials to exclude from CALID from a wide range of information included in Ford's IDS Software. Just as the creators of the IDS Software were free to represent the information in Ford's CALID Registration in innumerable ways, the creators of Launch's products were also free to design Launch's products in innumerable ways—even while making use of the same information. Nonetheless, the Ford_02.XML file copies the

---

[23] *See also Eckes v. Card Prices Update,* 736 F.2d 859, 863 (2d Cir. 1984) ("existence of common errors in two similar works" constitutes "strongest evidence of piracy"); *M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 446 (4th Cir. 1986) (finding direct evidence of copying where defendants' program, like plaintiff's, included "a hidden legend that would appear only when the [program's] buttons were pressed in an abnormal sequence"); *Warren Publ'g v. Microdos Data*, 52 F.3d 950, 955 (11th Cir. 1995) (inclusion of fictitious entries, "created as decoys," constitutes "strong evidence of copying), *vacated*, 115 F.3d 1509 (11th Cir. 1997) (denying protectability based on lack of authorship).

identical selection and arrangement of the columns, as well as the same ordering of the rows.  Cherry Dec. at ¶ 16.

ii.    **Ford has a Strong Likelihood of Success on the Merits of its Claims of Infringement of the MNEMONICS Registration.**

The evidence that Launch copied Ford's MNEMONICS is overwhelming. Ford has provided several examples of text displayed on Launch's products and identified the specific "mnemonics" associated with the identical text in Ford's MNEMONICS registration.  Exhibit N.  The likelihood of all of these examples being the result of independent creation is infinitesimally small.

Launch's copying is so blatant that the files produced by Launch copy text verbatim even when the text is obviously inapplicable to Launch's products.  For example, Ford's IDS Software utilizes a "tick" mark in many locations and instructs users to "press the Tick button" once certain actions have been completed. Even though Launch's products do not utilize a "Tick button," instead opting for the more common "OK" button,[24] the data files produced by Launch during the Source Code Review repeatedly refer to a "Tick" button.  Moreover, the Screen Captures establish that unique phrases appear identically and in the same frequency in Launch's files and in the MNEMONICS registration.

---

[24] Exhibit N illustrates several examples of the "OK" button on Launch's X-431 V product.

## II.   Ford Will Suffer Irreparable Harm Without Injunctive Relief.

It is well established in cases of trademark infringement that "[a] finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears.'" *Wynn Oil Co. v. American Way Svc. Corp.*, 943 F.2d 595, 604 (6th Cir.1991) ("Wynn II").  "The irreparable injury flows both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values." *Id.* (citation omitted).[25]

In the context of trade secrets, the "[l]oss of customer goodwill and fair competition can support a finding of irreparable harm.  Such losses often amount to irreparable injury because the resulting damages are difficult to calculate." *Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 847 (E.D. Mich. 1994) (concluding that use of confidential information concerning "specific needs and service provided to the plaintiff's clients" would enable defendant "effectively to solicit [the plaintiff's] clients, and to undercut [the plaintiff's] rates while providing the same services provided by [the plaintiff]").  In this case, Launch is using Ford's trade secrets in direct competition with Ford in connection with the sale of diagnostic tools for Ford vehicles.  It will be impossible to determine in

---

[25] *See also Standard & Poors Corp. v. Commodity Exch., Inc.*, 683 F.2d 704, 708 (2d Cir. 1982) (noting that "[i]n the preliminary injunction context [of a trademark action], a showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm").

litigation the detrimental impact on Ford's business and the advantages reaped by Launch as a result of such conduct.  "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark."  *State of Idaho Potato Comm'n v. G&T Terminal Pkg, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005).  As Professor McCarthy has explained: "A likelihood of damage to reputation is by its nature 'irreparable.'  Like trying to un-ring a bell, trying to 'compensate' after the fact for damage to business goodwill and reputation cannot constitute a just or full compensation."  MCCARTHY § 30:47.

Finally, "[i]n the copyright context, much rests on the first factor [of the four-part test] because irreparable harm is presumed once a likelihood of success has been established . . . and because an injunction likely will serve the public interest once a claimant has demonstrated a likelihood of success in this setting." *Lexmark Intl.*, 387 F.3d at 532-33.[26]  In *eBay, Inc. v. MercExchange, LLC*, the Supreme Court specifically recognized that "[a] copyright holder possesses 'the right to exclude others from using his property.'"  547 U.S. 388, 392 (2006).

---

[26] Courts in the Sixth Circuit have considered whether the presumptions related to irreparable harm continue to apply following *eBay* and have concluded that the presumptions continue to apply.  *See, e.g., Virtual Studios, Inc. v. Beaulieu Grp., LLC*, 987 F. Supp.2d 769, 779 (E.D. Tenn. 2013) (rejecting contention that presumptions of irreparable injury were rejected in *eBay*, noting "Sixth Circuit has continued to apply the above standard following *eBay*," and holding "infringement of intellectual property rights creates a unique harm" justifying injunctive relief).

Following *eBay*, the Sixth Circuit has recognized that the "right to exclude" is separate from the right to recover damages, and as "in copyright infringement actions, the denial of a request for injunctive relief could otherwise 'amount to a forced license to use the creative work of another.'" *Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F. 3d 470, 492 (6th Cir. 2007).

Still further, in *Audi AG v. D'Amato,* the Sixth Circuit explained that where there is potential for future harm from infringement, there is no adequate remedy at law. 469 F.3d at 550. In this case, the potential for future infringement is significant, particularly in view of the fact that Launch previously agreed to refrain from infringement of Ford's trademarks by executing the Letter Agreement, only to resume its acts of infringement once it believed that Ford was no longer monitoring Launch's activities.

## III.   The Balance of Hardship Weighs in Favor of Injunctive Relief.

The balance of hardships in this case likewise compels issuance of injunctive relief. As described in the previous sections, Ford has suffered and will continue to suffer irreparable harm if Launch is allowed to continue to utilize Ford's trademarks, trade secrets, and copyrights in direct competition with Ford. It is well recognized that an infringer cannot be heard to complain about an injunction that merely requires the defendant to comply with the Lanham Act and Copyright Act. *Id.* ("In balancing the hardships between each party, we note that D'Amato faces

23

no hardship in refraining from willful trademark infringement, whereas Audi faces hardship from loss of sales."); *Microsoft Corp. v. McGee*, 490 F. Supp.2d 874, 883 (S.D. Ohio 2007) ("the Court finds a permanent injunction is warranted because there is no harm to the Defendant inasmuch as an injunction will merely require Defendant to comply with the Copyright Act and Lanham Act").  Launch will suffer no undue hardship if injunctive relief is granted because a preliminary injunction would not prohibit Launch from engaging in activity that is lawful, but rather would only prohibit use of trademarks, trade secrets, and copyrights misappropriated by Launch.

## IV.    The Public Interest is Served by Granting Injunctive Relief.

It is in the public interest to safeguard fair competitive practices and technological investment.  *Blockbuster Entm't Grp. v. Laylco, Inc.*, 869 F. Supp. 505, 516 (E.D. Mich. 1994) ("Trademark laws are designed to prevent consumer confusion and to protect the right of the trademark owner to control its product's reputation."); Congressional Report 114-529, Defense of Trade Secrets Act of 2016, at *6 (Apr. 26, 2016) (noting that DTSA equips businesses with "the tools they need to effectively protect their intellectual property and ensures continued growth and innovation in the American economy"); *Telerep Caribe, Inc. v. Zambrano*, 146 F. Supp.2d 134, 136 (D. PR 2001) ("Simply stated, consumer confusion is contrary to the public interest."); *Apple Computer, Inc. v. Franklin*

24

*Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983) ("[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections.").

## **Conclusion**

For the reasons set forth herein above, Ford respectfully requests that the Court enter an injunction preventing Launch from continuing to misappropriate Ford's copyrights, trade secrets, and trademarks.

By:   /s/ Gregory D. Phillips

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2017, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to counsel of record.

By:    /s/ Jared L. Cherry_____