IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **FORD MOTOR COMPANY**, a Delaware corporation, and **FORD GLOBAL TECHNOLOGIES, LLC**, a Delaware limited liability company,<br><br>          Plaintiffs,<br><br>v.<br><br>**LAUNCH TECH CO. LTD.**, a Chinese corporation, and **LAUNCH TECH (USA), INC.**, a California corporation,<br>          Defendants. | Civil Action No. 2:17-cv-12906-NGE-DRG<br><br>Honorable Nancy G. Edmunds |

GREGORY D. PHILLIPS (P80801)
JARED L. CHERRY (P80800)
**PHILLIPS RYTHER &
WINCHESTER**
600 East 124 South
Salt Lake City, Utah 84102
Tel:  (801) 935-4935
Fax: (801) 935-4936
Attorneys for Plaintiff

**FORD'S COMBINED RESPONSE TO DEFENDANTS'
MOTIONS TO DISMISS**

Plaintiffs Ford Motor Company ("FMC") and Ford Global Technologies,

LLC ("FGTL") (collectively "Ford") respectfully submit this Combined Response

to the Motion to Dismiss (Doc. 27) of Launch Tech Co. Ltd. ("Launch China") and

to the belatedly filed[1] Motion to Dismiss (Doc. 33) of Launch Tech (USA), Inc. ("Launch USA") (collectively "Defendants" or "Launch").

In the interest of efficiency and brevity, Ford has consolidated this Response to Defendants' motions, one of which exceeded the page limitations imposed under LR 7.1(d)(3). This brief of 33 pages is far shorter than the number of pages that Ford could fill by responding to Defendants' motions separately, and is only 5 pages longer than Launch China's over-length brief.

---

[1] Adopting the parties' stipulation, the Court ordered "that Defendants Launch Tech Co. Ltd. and Launch Tech USA, Inc. shall have until December 21, 2017 to answer or otherwise respond to the amended complaint …." Doc. 4, Pg ID 155. Launch USA filed its motion to dismiss on December 27, 2017. Launch USA provides no explanation for its failure to comply with this Court's order. It is well established that certain defenses under Fed. R. Civ. P. 12(b) may be waived if not properly and timely asserted. *Gerber v. Riordan*, 649 F. 3d 514 (6th Cir. 2011). Launch's failure to comply with this Court's order is an independent basis upon which this Court may deny Launch's motion.

# TABLE OF CONTENTS

TABLE OF CONTENTS.........................................................................iii

TABLE OF AUTHORITIES ...............................................................v

STATEMENT OF ISSUES PRESENTED............................................vii

ARGUMENT ...................................................................................1

I.    Introduction .........................................................................1

II.   Defendants are Subject to Specific Jurisdiction Based on Numerous Contacts with Michigan and because Ford's Claims Arise Directly from Defendants' Contacts with This Forum. .................................................4

    a.    Defendants Satisfy the Purposeful Availment Prong by Purchasing Ford's IDS Software in Michigan, Establishing Distribution Networks for their Infringing Products in Michigan, Participating in ETI, and Entering into and Breaching Contracts with Ford in Michigan. .................................5

    b.    Ford's Causes of Action Arise Directly from Defendants' Contacts with Michigan. ...........................................................14

    c.    Defendants' Activities in Michigan are Substantial Enough to Make the Exercise of Jurisdiction Reasonable.................................15

III.  Defendants' Venue Arguments Fail Because Defendants "May be Found" in this District and Because a Substantial Part of the Events Giving Rise to the Claims Occurred in this District.................................17

IV.   Launch USA's Motion to Transfer Benefits Only Launch USA and Fails to Establish that Fairness and Practicality "Strongly" Favor Transfer.................19

V.    Ford's FAC Alleges with Ample Specificity Factual Allegations Sufficient to Support All of Ford's Causes of Action.................................21

    a.    Count 1 – Launch's Misappropriation of Ford's World-Famous Trademarks is Likely to Cause Confusion. .................................22

    b.    Counts 2-4 – The Standard for Trademark Infringement is the Same as the Standard for False Designation of Origin. .................................24

c.    Count 5 – Launch's Use of Ford's World-Famous FORD OVAL® is an "Obvious Case" of Dilution Under Supreme Court Precedent. .......................... 25

d.    Counts 6 and 7 – Ford's Complaint Alleges a Cause of Action for Misappropriation of Trade Secrets. ............................................................ 26

e.    Count 8 – Ford's Complaint Alleges a Cause of Action for Copyright Infringement. ............................................................................................. 29

f.    Count 9 – The EULA Governing Ford's IDS Software "Closes IDS's Door to Diagnostic Tool Manufacturers." ................................................. 32

VI.  Conclusion. ......................................................................................................... 33

# TABLE OF AUTHORITIES

## Cases

*Aetna, Inc. v. Flugel*, 2008 Conn. Super. LEXIS 326 (Conn. 2008).......................28

*Air Prods. & Controls, Inc. v. Safetech Int'l*, 503 F.3d 544 (6th Cir. 2007)............4

*AlixPartners, LLP v. Brewington*, 836 F.3d 543 (6th Cir. 2016) ............................4

*Audi AG v. D'Amato*, 341 F. Supp.2d 734 (E.D. Mich. 2004) ........................ 17, 19

*Audi AG v. D'Amato*, 469 F.3d 534 (6th Cir. 2006) ..................................................25

*Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994)...10

*Beydoun v. Wataniya Rests. Holding*, 786 F.3d 499 (6th Cir. 2014) .................5, 14

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)................................ 5, 13, 14

*CompuServe v. Patterson*, 89 F.3d 1257 (6th Cir. 1996) ...................... 4, 10, 12, 15

*Conceivex, Inc., v. Rinovum Women's Health*, No. 15-cv-14239 (E.D. Mich. Aug. 15, 2017)...........................................................................................................19

*Directv, Inc. v. Treesh*, 487 F.3d 471 (6th Cir. 2007) .............................................22

*Eckes v. Card Prices Update*, 736 F.2d 859 (2d Cir. 1984)....................................30

*Ford Motor Co. v. Heritage Mgmt. Grp.*, 911 F. Supp.2d 616 (E.D. Tenn. 2012).26

*Hayden v. Chalafant Press*, 281 F.2d 543 (9th Cir. 1960).....................................30

*Hoffman v. Blaski*, 363 U.S. 335 (1960)..................................................................21

*In re Fine Paper Antitrust Litigation*, 685 F. 2d 810 (3rd Cir. 1982) ....................21

*In re Under Seal*, 749 F.3d 276, 280 (4th Cir. 2014) ..............................................28

*Innovation Ventures, LLC v. Custom Nutrition Labs.*, 946 F. Supp.2d 714 (E.D. Mich. 2013) ..................................................................................................8

*John Labatt Ltd. v. Molson Breweries,* 853 F. Supp. 965 (E.D. Mich. 1994).........24

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc*., 502 F.3d 504 (6th Cir. 2007) ..24

*M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421 (4th Cir. 1986) .............................30

*Microsoft Corp. v. Compusource Distribs., Inc.*, 115 F. Supp.2d 800 (E.D. Mich. 2000)....................................................................................................................25

*Mihalek Corp. v. Michigan*, 595 F. Supp. 903 (E.D. Mich. 1984).........................17

*Mike's Train House, Inc. v. Lionel*, 472 F.3d 398 (6th Cir. 2006) ..........................28

*Moseley v. V. Secret Catalogue*, 537 U.S. 418, 123 S.Ct. 1115 (2003) .................25

*Neal v. Janssen*, 270 F.3d 328, 331 (6th Cir. 2001) ...................................................6

*Original Creations, Inc. v. Ready Am., Inc.*, 836 F. Supp.2d 711 (N.D. Ill. 2011)...8

*Paccar v. Telescan Techs.*, 319 F.3d 243 (6th Cir. 2003) .......................................22

*Petrella v. Metro-Goldwyn-Mayer*, 572 U.S. ____, 134 S. Ct. 1962 (2014) .........29

*Rowe v. Chrysler Corp.*, 520 F. Supp. 15 (E.D. Mich.1981) ...................................19

*Service Solutions U.S., L.L.C. v. Autel U.S. Inc.*, No. 13-10534, 2013 WL 5701063 (E.D. Mich. Oct. 18, 2013)...............................................................................10

*Shields v. Zuccarini*, 254 F.3d 476 (3d Cir. 2001)...................................................23

*Sullivan v. Tribley*, 602 F. Supp.2d 795 (E.D. Mich. 2009) ...................................21

*TC Heartland v. Kraft Foods Grp. Brands*, 137 S. Ct. 1514, 581 U.S. __ (2017)...3, 18

*Two Pesos v. Taco Cabana*, 505 US 763, 112 S. Ct. 2753 (1992)..........................24

*U.S. v. Edward Rose & Sons*, 246 F. Supp.2d 744 (E.D. Mich. 2003)...................21

*Warren Publ'g v. Microdos Data*, 52 F.3d 950 (11th Cir. 1995)...........................31

*World-Wide Volkswagen v. Woodson*, 444 U.S. 286 (1980)...............................7, 15

**Statutes**

15 U.S.C. § 1125 ...................................................................................................25

28 U.S.C. § 1391 ...................................................................................................17

28 U.S.C. § 1400 ...................................................................................................18

**Treatises**

3 M. Nimmer & D. Nimmer, Copyright § 12.05 ....................................................29

## STATEMENT OF ISSUES PRESENTED

1.      Is Launch China subject to specific personal jurisdiction in Michigan when Launch China: (a) acted in concert with Launch USA to obtain and download Ford's IDS Software from Ford servers in Michigan by transacting business with Ford in Michigan, (b) accepted the terms of the Ford End User License Agreement ("EULA") governing Ford's IDS Software and violated those terms by extracting Ford's copyrights and trade secrets, (c) directly sells diagnostic software products in Michigan incorporating the copyrights and trade secrets extracted from Ford's IDS Software using Apple's iTunes Store and Paypal, and (d) operates an interactive website where Michigan residents who purchase Launch China's products may download software incorporating the copyrights and trade secrets extracted from Ford's IDS Software.

2.      Is Launch USA subject to specific personal jurisdiction in Michigan when Launch USA: (a) obtained and downloaded Ford's IDS Software from Ford servers in Michigan by transacting business with Ford in Michigan and then provided Ford's IDS Software to Launch China, (b) distributes products incorporating the copyrights and trade secrets extracted from Ford's IDS Software through a distribution network in Michigan, (c) is a member of an industry trade association related to Ford's IDS Software, ETI, headquartered in Michigan, (d) located its "vice president" over automotive diagnostics in the "Greater Detroit

Area" in proximity to ETI, Ford, and other automotive manufactures, and (e) entered into a written agreement with Ford to cease and desist from infringement of Ford's trademarks.

3.     Should this Court dismiss Ford's claim for trademark infringement when (a) Defendants' products bear Ford's world-famous trademarks, (b) Defendants misappropriate Ford's trademarks in their advertising and promotional materials, (c) Launch USA specifically agreed in writing to cease and desist from future trademark infringement, (d) binding precedent holds that use of another's stylized trademark or logo gives rise to a presumption of an intent to confuse, and (e) Defendants have failed to cite a single case finding dismissal appropriate under such circumstances?

4.     Should this Court dismiss Ford's state-law claims for false designation, unfair competition, and violation of the Michigan Consumer Protection Act, when the same standard governing Ford's trademark infringement claims applies to such claims and when liability may be based on the same activities?

5.     Should this Court dismiss Ford's claim for trademark dilution when the Supreme Court has described the scenario presented in this case as an "obvious case" of dilution?

6.      Should this Court dismiss Ford's claim for misappropriation of trade secrets when Defendants' arguments are based on assertions of fact that are flatly contradicted by the allegations in Ford's First Amended Complaint, which must be deemed true for purposes of this motion?

7.      Should this Court dismiss Ford's claim for copyright infringement when (a) Supreme Court precedent directly contradicts Defendants' arguments regarding the statute of limitations, (b) Ford's First Amended Complaint satisfies the standard stated in Defendants' motion, and (c) Defendants' copying is evidenced by Defendants' copying fictitious information from Ford's copyright registration used to ensnare pirates?

8.      Should this Court dismiss Ford's claim for breach of contract when Judge Berg found that an argument very similar to Defendants' was "not well received" and determined that the end-user license agreement closes "[the software's] doors to diagnostic toolmakers," such as Defendants?

## ARGUMENT

## I.  <u>Introduction</u>

Launch continues in its attempts to delay these proceedings by moving for
dismissal based on at least ten separate grounds, nearly all which were previously
considered and soundly rejected by Judge Berg in a virtually identical lawsuit Ford
filed against another diagnostic tool maker and its U.S. distributor, *Ford Motor Co.
v. Autel US Inc.*, Civil No. 4:14-cv-1376 (the "*Autel* Litigation").  Defendants'
motivation to delay is strong because Ford has moved for a preliminary injunction
and Defendants generate millions of dollars in sales every month from their
infringing diagnostic tools.  For example, Launch's 2013 annual investor report
claims sales of 62,000 units of just two of the products at issue, the X431-iDiag
and the X431 Pro.  Exhibit A.  According to AutoZone, one of Launch USA's
Official Dealers, the X431 Pro's retail price is $1,895.00.  Exhibit B.  A single
year's sales revenue equals $117,490,000, or nearly $10,000,000 per month.  With
so much at risk and the compelling evidence of Launch's infringement shown in
Ford's motion for preliminary injunction, Launch has every incentive to delay.

Defendants' motions fail for several reasons.  First, with regard to
Defendants' motions to dismiss under Fed. R. Civ. P. 12(b)(2), Defendants have
engaged in numerous activities purposefully directed toward Michigan that give
rise to Ford's claims and subject Defendants to jurisdiction here.  Launch China

and Launch USA repeatedly reached into Michigan to buy licenses from Ford for Ford's IDS Software—the Software that is at the heart of this case.  Defendants then downloaded Ford's IDS Software from Ford servers located in Michigan, accepted and breached Ford's end user license agreement by extracting Ford's copyrights and trade secrets, and incorporated Ford's copyrights and trade secrets into Launch products sold in Michigan.  Launch China engages in direct sales to Michigan residents of products that incorporate Ford's copyrights and trade secrets via iTunes and Paypal, including the Ford "vehicle line" for Launch's EasyDiag product.  Launch USA sells infringing products in brick-and-mortar retail facilities throughout Michigan where private investigators acting on Ford's behalf have purchased Launch's infringing products.  Doc. 16 at ¶ 8-9.  Still further, Defendants are members of and actively participate in Electronic Tools Institute ("ETI"), a diagnostic tool trade association headquartered in Michigan.  ETI collects data from Ford and other automotive manufacturers and provides that information to diagnostic tool manufacturers, such as Launch, for use in developing the diagnostic tools at issue in this case.  In the *Autel* Litigation, Judge Berg found the Defendants' participation in ETI to be a meaningful contact with Michigan because the defendants availed themselves of the privilege of acting in Michigan to obtain information from Ford and other Michigan-based automotive manufacturers that was then used in the development of the infringing products.

Second, Defendants' venue arguments are misplaced because they rely on authorities interpreting a venue statute applicable exclusively to patent actions, while ignoring the venue statute applicable to copyright actions that governs in this case. The holding of *TC Heartland v. Kraft Foods Grp. Brands LLC,* 581 U.S. __ (2017), is expressly limited to actions for *patent* infringement under 28 U.S.C. § 1400(b). In contrast, 28 U.S.C. § 1400(a) governs venue of suits for *copyright* infringement, and decisions from this Court following TC Heartland have continued to equate § 1400(a) as co-extensive with personal jurisdiction.

Third, Launch USA's request to transfer venue fails for two reasons: (1) Launch USA fails to identify any party, other than itself, that would benefit from such a transfer, and (2) Launch USA fails to even allege, much less prove by a preponderance of the evidence, that Launch China is subject to jurisdiction in the proposed transferee forum.

Fourth, the same arguments raised by Defendants' 12(b)(6) motions were considered and rejected by Judge Berg in the *Autel* Litigation. Launch China was a third-party defendant in the *Autel* Litigation and knows that these issues were thoroughly considered and rejected by Judge Berg. Defendants fail to inform this Court of Judge Berg's rulings or explain why this Court should reject Judge Berg's analysis and reach the opposite conclusion on nearly every identical issue.

## II.    Defendants are Subject to Specific Jurisdiction Based on Numerous Contacts with Michigan and because Ford's Claims Arise Directly from Defendants' Contacts with This Forum.

When a 12(b)(2) motion is decided without an evidentiary hearing,[2] "the burden of the plaintiff is relatively slight, and the plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal."[3]  In this posture, "a court disposing of a 12(b)(2) motion does not weigh the controverting assertions of the party seeking dismissal . . . to prevent non-resident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts."  *CompuServe v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996).

This Court is constrained in its exercise of personal jurisdiction under Michigan's long-arm statute only by constitutional principles of Due Process, as determined by a three-part test:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.  Second, the cause of action must arise from the defendant's activities there.  Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549-550 (6th Cir. 2016).

---

[2] Neither Launch China nor Launch USA requested an evidentiary hearing.
[3] *Air Prods. & Controls, Inc. v. Safetech Int'l*, 503 F.3d 544, 549 (6th Cir. 2007).

4

### a. Defendants Satisfy the Purposeful Availment Prong by Purchasing Ford's IDS Software in Michigan, Establishing Distribution Networks for their Infringing Products in Michigan, Participating in ETI, and Entering into and Breaching Contracts with Ford in Michigan.

The Sixth Circuit has found that "[p]urposeful availment is present where the defendant's contacts with the forum state proximately result from actions by the defendant himself that create a substantial connection with the forum state." *Beydoun v. Wataniya Rests. Holding*, 786 F.3d 499, 505-06 (6th Cir. 2014). This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts," or the actions of a third-party. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). There are at least four distinct bases upon which this Court should find that Defendants have purposefully availed themselves of the "privilege of acting" and "causing a consequence" in Michigan.

### i. Defendants' Repeated and Concerted Actions to Acquire Ford's IDS Software in Michigan Are a Sufficient Basis upon which an Exercise of this Court's Jurisdiction is Appropriate and Reasonable.

First, Ford's First Amended Complaint ("FAC") alleges that Launch USA acted as the "agent" of Launch China and that it acted with "permission and consent" to obtain Ford's IDS Software on Launch China's behalf. Doc. 16 at ¶ 52. Launch China argues that it—along with "several other" unnamed infringers— "look to [IDS] for their own database systems." Doc. 27, at 23, Pg ID 505. In

view of Defendants' admissions and declarations that they "look to [IDS]" to create their products, there can be no dispute[4] that the IDS subscriptions at issue were acquired at Launch China's direction to develop the infringing products. Doc. 16 at ¶¶ 39-40; Doc 16-8 (history of purchases by "L aunch").[5]

"[E]ven a single act by [the] defendant directed toward [the forum] that gives rise to a cause of action can support a finding of minimum contacts sufficient to exercise personal jurisdiction without offending due process." *Neal v. Janssen*, 270 F.3d 328, 331 (6th Cir. 2001). In this case, Defendants' acquisition of IDS Software from Ford servers in Michigan[6] for the purposes of extracting Ford's trade secrets for use in "their own database systems" is central to Ford's claims, and, accordingly, this action alone is a sufficient basis upon which this Court can

---

[4] ETI is the only source through which Ford makes available diagnostic trouble codes for use by diagnostic tool manufacturers without a direct contractual relationship with Ford. Launch does not have a contractual relationship with Ford pursuant to which Ford would provide Launch with Ford-related diagnostic information. Accordingly, if Defendants do not use data from ETI, the only other alternative is that Defendants "look to [IDS] for their own database systems" as alleged in Ford's complaint.

[5] Launch purposefully misspelled its name "L aunch" when obtaining licenses from Ford in an attempt to make it more difficult for Ford to search its databases for purchases of IDS by "Launch."

[6] Ford's operative complaint includes detailed factual allegations relating to Defendants' acquisition of the IDS in Michigan, including the creation of an account with Ford under the name "L aunch," payments to a Ford vendor via servers located in Michigan to acquire "activation codes" for Ford's IDS Software, and the exchange of "activation codes" between Ford's licensing servers located in Michigan and the computers on which Defendants installed Ford's IDS Software. Doc. 16, at ¶¶ 39-50.

exercise jurisdiction over Launch USA and Launch China.

The concerted actions of Defendants alleged in Ford's FAC—to acquire Ford's IDS Software from Ford servers in Michigan, to extract Ford's trade secrets, and to incorporate Ford's trade secrets into Defendants' products—are deliberate and calculated, and have allowed Defendants to generate millions of dollars in revenue per month from just one of the products at issue. *See* Exhibit A. In view of these facts, Defendants "should reasonably anticipate being haled into court"[7] in Michigan.

> ### ii. Defendants' Have Each Established Networks to Distribute their Infringing Products in Michigan and Launch China Engages in Direct Sales of Infringing Products in Michigan through its EasyDiag App.

Defendants utilize multiple strategies to sell their infringing products in Michigan, including through brick-and-mortar retail chains in Michigan and direct sales.[8] Sale of infringing products in Michigan, particularly where such products are sold directly by the defendant, is a sufficient basis for this Court to exercise specific jurisdiction for claims arising from such sales.

When a defendant establishes distribution networks to sell infringing goods

---

[7] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

[8] Doc. 16 at ¶¶ 8-9 (alleging facts relating to Defendants' distribution networks and availability of infringing products for purchase in brick-and-mortar chains in Michigan); ¶¶ 25-28 (alleging facts relating to distribution of infringing content from Launch China's website); ¶¶ 30-31 (alleging facts relating to direct sales through Launch China's EasyDiag app and Paypal).

to retailers known to have locations in Michigan, courts have repeatedly found purposeful availment.[9]   In this case, Launch China and Launch USA have each established distribution networks in Michigan and throughout the United States, including large retail chains specializing in the sale of automotive repair products, such as Matco,[10] Napa Auto Parts, Mac Tools, AutoZone, and Car Quest.[11]   Judge Berg cited Autel's use of a "distribution network in Michigan" in the *Autel Litigation* as one factor supporting the conclusion that "Ford has clearly alleged that Autel ITC [China] has purposefully availed itself of the privilege of acting in Michigan."  Case No. 4:14-cv-13760, Doc. 24 at 27, Pg ID 241.

Launch China's motion refers to "Launch USA's exclusive license to sell

---

[9] *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 131 S. Ct. 2780, 2788 (2011) (plurality opinion) ("a defendant may in an appropriate case be subject to jurisdiction without entering the forum—itself an unexceptional proposition—as where manufacturers or distributors 'seek to serve' a given State's market"); *Innovation Ventures, LLC v. Custom Nutrition Labs.*, 946 F. Supp.2d 714, 723 (E.D. Mich. 2013) (finding specific jurisdiction where defendant was "knowingly and intentionally taking advantage of the established distribution chains of multiple national retailers, for the purpose of selling its products in as many stores as possible, including those in this district"); *Original Creations, Inc. v. Ready Am., Inc.*, 836 F. Supp.2d 711, 716 (N.D. Ill. 2011) (same).
[10] Launch China sells products directly to Matco.  *Autel* Litigation Doc. 66, Declaration of James Jiang ("In the United States, Launch China sells to two third-party distributors, Matco Tools ('Matco') and Launch Tech (USA), Inc. ('Launch USA')"); Exhibit A (showing direct sales to Matco).
[11] Doc. 16 at ¶ 8 and Image 1 (showing Launch USA's website with identified chains under heading "Our Dealers").

Launch-brand products,"[12] and implies that Launch USA is therefore the sole source through which "Launch-brand products" are distributed in the United States—an implication contradicted both by a previously filed declaration by James Jiang on behalf of Launch China[13] and by Launch China's annual report, which separately shows sales to Launch USA and Matco.  Launch USA and Matco represented Launch China's first and second largest customers, respectively, in 2013.  Exhibit A.

In addition to direct sales to Matco, Launch China also directly sells and distributes products misappropriating Ford's copyrights and trade secrets through its *x431.com* website and through its EasyDiag App.  Ford alleges that users of X-431 Pro must register on *x431.com* to utilize the product, Doc. 16 at ¶ 26, which entails selection of the software to download by name from a list of names including "USA FORD," which software includes the trade secrets and copyrights at issue.  Exhibit C.  Under similar circumstances in a virtually identical case, Judge Berg held that such "electronic 'updates' amount to digital instructions transmitted from Autel ITC [China] to end users, in order to change software programming contained in various products, at least some of which are physically

---

[12] Doc. 27 at 9, Pg. ID 491.

[13] *Autel* Litigation Doc. 66, Declaration of James Jiang ("In the United States, Launch China sells to two third-party distributors, Matco Tools ('Matco') and Launch Tech (USA), Inc. ('Launch USA').")

located in Michigan.  These contacts constitute additional, though unnecessary, plus factors supporting jurisdiction."[14]

Launch China concedes that it directly collects revenue via Paypal for sales of "vehicles lines," including Ford, using its EasyDiag app, which Launch China makes available throughout the United States through "third-party app stores." Doc. 29, at ¶¶ 12-13.  A defendant's marketing and sale of an infringing product in a forum is highly relevant to, and is in many cases determinative of, whether the defendant is subject to jurisdiction in the forum.[15]

In spite of conceding that it directly sells the products at issue into Michigan, Launch China argues that this Court cannot exercise jurisdiction over Launch China because (1) Launch China elects *not* to collect "address information or other geographic information," and (2) payments made via Paypal are allegedly subject to the exclusive jurisdiction of courts in Singapore.

With regard to point (1), Launch China cites no authority supporting the dubious proposition that a defendant is entitled to avoid the possibility of "being haled into court" in jurisdictions where it directly sells infringing products based

---

[14] *Service Solutions U.S., L.L.C. v. Autel U.S. Inc.*, No. 13-10534, 2013 WL 5701063 (E.D. Mich. Oct. 18, 2013).

[15] *CompuServe*, 89 F.3d at 1264 (holding defendant subject to jurisdiction in Ohio where he chose to electronically "market his wares in Ohio"); *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1571 (Fed. Cir. 1994) (injury occurs where infringing sales are made).

on the defendant's calculated decision to be willfully blind to the location of its customers. Such a claim merely establishes that Launch China cannot provide any shred of evidence to refute the allegation in Ford's FAC that some of Launch China's customers are "physically located in Michigan. Doc. 16 at ¶ 29.

With regard to point (2), Paypal China's user agreement is only applicable to disputes between PayPal and Launch China. Launch China apparently relies[16] on the section captioned "Disputes with Paypal," which provides "you agree that any claim or dispute *you may have against PayPal must be resolved by a court located in Singapore* or where the defendant is located." Doc. 37 at 16, Pg ID 928. Contrary to Launch's assertions, nothing in the Paypal China agreement purports to limit this Court's jurisdiction, nor would any such limitation, if it existed, be binding upon this Court.

### iii. "Launch Tech" is a Member of a Diagnostic Tool Industry Trade Association Based in Michigan, to which Ford Provides Diagnostic Information for use in Third-Party Diagnostic Tools.

This Court's exercise of jurisdiction is also appropriate based on the participation of "Launch Tech"[17] in ETI because defendants availed themselves of

---

[16]Launch China fails to identify any specific provisions of the 42-page PayPal China User Agreement that allegedly preclude this Court's exercise of jurisdiction.
[17] ETI's website identifies the member only as "Launch Tech," which could refer to either "Launch Tech USA, Inc." or to "Launch Tech Co. Ltd," since both entities begin with the terms "Launch Tech." *See* Doc. 16-2 (attaching list of ETI

the privilege of acting in Michigan to obtain information from Ford and other Michigan-based automotive manufacturers for use in the development of the products at issue.[18]  ETI is headquartered in Michigan and gathers diagnostic information from Ford for distribution to ETI members for use in diagnostic tools compatible with Ford vehicles.  Doc. 16 at ¶¶ 9-10.[19]

Ford further alleges that two of Launch USA's employees or agents are "active participants" in ETI, including Harlan Siegel, Launch USA's "Vice President, Diagnostics."  Doc. 16 at ¶¶ 13-14; Doc 16-4 (showing Mr. Seigel's location as the "Greater Detroit Area").  Launch USA's decision to station Mr. Seigel in this "distant forum," where Launch USA asserts that litigating before this Court will be a "tremendous burden,"[20] speaks to the benefits Defendants perceive

---

members)

[18] Doc. 16 at ¶ 21 ("By virtue of "Launch Tech's" membership in ETI, Launch China obtains information relating to Ford vehicles from ETI's TEK NET Library to develop products at issue in this lawsuit").

[19]  Launch China and Launch USA both deny accessing information made available to "Launch Tech" by virtue of its membership in ETI.  Doc. 29 at ¶ 7 ("Launch China has received no information or other benefit from Launch USA's membership in ETI"); Doc. 33-1 at ¶ 8 ("Launch USA has never obtained any software or data pertaining to Ford vehicles from any database accessible through the Equipment and Tool Institute ('ETI')).  "[A] court disposing of a 12(b)(2) motion does not weigh the controverting assertions of the party seeking dismissal…." *CompuServe*, 89 F.3d at 1262.

[20] Doc. 33 at 10, Pg. ID 824 ("To force a small company like Launch USA to litigate against a large plaintiff like Ford in a distant forum with which Launch USA has no contacts would work a tremendous burden and injustice on Launch USA").

in Mr. Siegel's proximity to ETI, as well as the presence of Ford and other automobile manufacturers.  Judge Berg identified Autel's participation in ETI in support of the conclusion that Autel "purposefully availed itself of the privilege of acting in Michigan." *Autel* Litigation, Doc. 24 at 27, Pg ID 242.

### iv.   Defendants Have Entered into Contracts in Michigan with Ford and Breached those Contracts.

In *Burger King*, the Supreme Court considered "whether and to what extent a contract can constitute a 'contact' for purposes of due process analysis."  471 U.S. at 478.  The Court concluded that contracts are a "contact" for purposes of personal jurisdiction and that breach may give rise to "foreseeable injuries" in a forum where the non-breaching party is located.  *Id.* at 480.  The specific breaches at issue in *Burger King* related to the defendant's unauthorized "use of Burger King's trademarks and confidential business information."  *Id.*  In considering the impact of these breaches on the non-breaching party, the Supreme Court found that it was "presumptively reasonable for [the Defendant] to be called to account there [i.e., the forum where Burger King was located] for such injuries."  *Id*.

In this case, Launch USA entered into and breached a contract with Ford to cease and desist from its unlawful use of Ford's trademarks.[21]  In view of Launch USA's written agreement to "cease and desist all use of Ford's trademarks" and

---

[21] Doc. 16 at ¶¶ 68-69; Doc. 16-10 (attaching Cease and Desist Agreement signed by Launch USA).

Launch's subsequent resumption of its infringing conduct,[22] Defendants' conduct was knowing, willful, and specifically targeted at Ford in Michigan.

Launch USA and Launch China each entered into and breached the EULA with Ford, governing Defendants' use of Ford's IDS Software.[23]  As in *Burger King*, the contracts at issue in this case protect Ford's "trademarks and confidential business information [i.e., Ford's trade secrets contained in Ford's IDS Software]."  By virtue of Defendants' breaches, Defendants have "caused foreseeable injuries to [Ford] in [Michigan]," and, just as in *Burger King*, that Defendants be called to account in Michigan is "presumptively reasonable."  *Id.*

### b. <u>Ford's Causes of Action Arise Directly from Defendants' Contacts with Michigan.</u>

The second prong is satisfied because Ford's causes of action are proximately caused by Defendant's actions in Michigan.  *Beydoun*, 768 F.3d at 507- 508 (citing Burger King Corp., 471 U.S. at 474).  Each of Defendants' contacts with Michigan give rise to Ford's claims.  Launch's acquisition of IDS Software in Michigan gives rise to and is directly related to Ford's claims for copyright infringement and theft of trade secrets because Launch obtained access to these assets only by its acquisition of the IDS Software from Ford in Michigan.

---

[23] Doc. 16 at ¶¶ 181-186; Doc. 16-19 (attaching EULA binding any user that "install[s], cop[ies] or otherwise us[es] the product").

14

Further, Launch's extraction of Ford's copyrights and trade secrets, in violation of the EULA governing use of Ford's IDS Software, gives rise to Ford's claims for breach of contract.  Launch's sale of infringing products in Michigan gives rise to Ford's claims for trademark infringement, copyright infringement, theft of trade secrets, and unfair competition.

### c. Defendants' Activities in Michigan are Substantial Enough to Make the Exercise of Jurisdiction Reasonable.

"[W]hen the first two elements [of the jurisdictional analysis] are met, an inference arises that the third, fairness, is also present; only the unusual case will not meet this third criterion." *Third Nat. Bank*, 882 F.2d at 1092.  "A court must consider several factors in this context, including [1] the burden on the defendant, [2] the interest of the forum state, [3] the plaintiff's interest in obtaining relief, and [4] the interest of other states in securing the most efficient resolution of controversies." *CompuServe*, 89 F.3d at 1268.

With regard to this prong, Launch China provides only one conclusory sentence: "the burden on Launch China, a Chinese company with no contacts to Michigan, to defend itself in Michigan is substantial."  Doc. 27 at 12, Pg. ID 494. Even if Launch China does face some burden, "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." *World-Wide Volkswagen*, 444 U.S. at 294 .  Moreover, Launch China is a large, publicly-traded, multinational organization, with a market

15

capitalization of approximately $450 million USD.[24]  Launch China's 2013 annual

report shows sales of $60.73 million HK to Launch Tech (USA) and sales of

$39.96 million HK to Matco.  These combined sales amount to $12.88 million

USD, and Launch realized growth in "America"[25] of 39% in 2013.  Exhibit A.

Although Launch China's public disclosures do not provide a state-by-state

breakdown and Launch China has attested that it does not possess such

information, the fact is clear that Launch China conducts considerable business in

the United States and profits handsomely from it.  Accordingly, it is not

unreasonable for this Court to exercise jurisdiction over Launch China.

     The analysis of reasonableness is not limited to the defendant's burden, but

must also include factors 2-4, all of which weigh in favor of the exercise of

jurisdiction.  Indeed, in connection with the Defend Trade Secrets Act ("DTSA"),

Congress made clear that the statute's purpose is to allow American innovators,

such as Ford, to pursue claims against foreign companies who engage in the theft

of trade secrets.[26]  Similarly, "Michigan has a strong interest in protecting

companies that principally reside here against trademark infringement."  *Audi AG*

---

[24] See e.g. https://www.reuters.com/finance/stocks/overview/2488.HK.

[25] Launch's report does not identify the specific countries in "America" included in the report or provide information on a country-specific level.

[26] "As trade secret owners increasingly face threats from both at home and abroad, the bill equips them with the tools they need to effectively protect their intellectual property and ensures continued growth and innovation in the American economy." S. Rep. No. 114-220, at 15 (2016).

*v. D'amato*, 341 F. Supp.2d 734, 748 (E.D. Mich. 2004).  In addition, Ford has a strong interest in defending its intellectual property rights in Michigan.  As a result of these factors, along with the contacts with Michigan outlined above, this Court's exercise of jurisdiction over Defendants is reasonable.

### III.   Defendants' Venue Arguments Fail Because Defendants "May be Found" in this District and Because a Substantial Part of the Events Giving Rise to the Claims Occurred in this District.

"The general rule of construction of § 1400(a) is that a defendant or his agent 'may be found' in any district in which he is amenable to personal jurisdiction . . . ."[27]  Venue is proper under § 1400(a) because Defendants are "amenable to personal jurisdiction" in this District.  Moreover, Ford's FAC further establishes that "a substantial part of the events or omissions giving rise to the claim occurred" in this district under 28 U.S.C. § 1391(b)(2).  Doc. 16. at ¶ 53. The specific "events" include the above-identified actions that also subject Defendants to jurisdiction in this forum.

Launch China's venue arguments are predicated entirely on the assertion that this Court lacks personal jurisdiction over Launch China.  To the extent that this Court finds that it has personal jurisdiction over Launch China, Launch China's venue arguments must be rejected.

---

[27] *Mihalek Corp. v. Michigan*, 595 F. Supp. 903, 907 (E.D. Mich. 1984), *aff'd*, 814 F.2d 290 (6th Cir. 1987).

Launch USA and Launch China both curiously and erroneously argue that the Supreme Court's decision in *TC Heartland* restricts venue in a copyright action to the defendant's "State of incorporation."[28]  This argument, however, is flatly contradicted both by the express holding of *TC Heartland* and the significant differences between §1400(a) and §1400(b).  As shown in the following side-by-side comparison, the broad language "may be found" appears only in § 1400(a).  In contrast, the patent venue statute of §1400(b) includes a narrowing requirement that the forum must be one in which the defendant "has a regular and established place of business."

| 28 U.S.C. § 1400 | |
|---|---|
| (a) Civil actions, suits, or proceedings arising under any Act of Congress relating to copyrights or exclusive rights in mask works or designs may be instituted in the district in which the defendant or his agent resides *or may be found*. | (b) Any civil action *for patent infringement* may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement *and has a regular and established place of business*. |

The Supreme Court's holding in *TC Heartland* is specifically limited to section 1400(b).[29]  Following *TC Heartland*, judges in this district have continued to

---

[28] Doc. 27 at 13, Pg ID 495; Doc. 33 at 23, Pg ID 826.

[29] "We conclude that the amendments to §1391 did not modify the meaning of *§1400(b)* as interpreted by *Fourco*.  We therefore hold that a domestic corporation 'resides' only in its State of incorporation *for purposes of the patent venue statute*." 581 U.S. at __ [*Slip Opinion* at 2] (emphasis added).

interpret the "may be found" language of §1400(a) as being co-extensive with personal jurisdiction.[30]

### IV. Launch USA's Motion to Transfer Benefits Only Launch USA and Fails to Establish that Fairness and Practicality "Strongly" Favor Transfer.

Launch USA seeks to transfer this case to the Central District of California; however, transfer complicates rather than simplifies the litigation. Under 28 U.S.C. § 1404, "[t]he movant carries the burden of showing that once all the relevant factors are scrutinized, fairness and practicality *strongly* favor the forum to which transfer is sought." *Rowe v. Chrysler Corp.*, 520 F. Supp. 15, 16 (E.D. Mich.1981) (emphasis in original); *Audi AG*, 341 F. Supp.2d 734, 749 (same).

Launch USA is the only party located in California, and Launch USA has repeatedly and specifically argued that it has little if any information relevant to the substance of this action. *See* Doc. 33-1 (attesting "Launch USA does not originate the software or data that is in the accused devices"). *See also* Doc. 16-5 (asserting Launch USA "has nothing to do with writing the software" at issue and denying the "capability" of any Launch USA employee to engage in reverse engineering). In view of such claims, Launch USA's motion cannot be granted, since "fairness and practicality" foreclose the possibility of transferring a case involving three

---

[30] *See Conceivex, Inc., v. Rinovum Women's Health*, No. 15-cv-14239 (E.D. Mich. Aug. 15, 2017).

parties to the home forum of the party with the *least* information.

Moreover, claims that the "distributors" and other witnesses are located in California[31] are false according to Launch China's prior declarations in the *Autel* Litigation and by publicly available information.  Mr. Jiang previously declared that Matco is a distributor located in Ohio.[32]  As for Launch USA's other "distributors": AutoZone has its corporate headquarters in Memphis, Tennessee, and is incorporated in Nevada;[33] Car Quest, which is owned and operated by Advance Auto Parts, Inc., is headquartered in Roanoke, Virginia, and incorporated in Delaware;[34] Mac Tools, which is owned and operated by Stanley Black & Decker, Inc. is headquartered in New Britain, Connecticut, and incorporated in Connecticut.[35]

Launch USA does not identify any witnesses by name and provides only the

---

[31] Doc. 33 at 26, Pg ID 829 (representing that Launch USA's "distributors" are "located in California").

[32] *Autel* Litigation, Doc. 66 at ¶ 4, Pg ID 1865 ("In the United States, Launch China sells to two third-party distributors, Matco Tools ('Matco') and Launch Tech (USA), Inc. ('Launch USA').  I am informed that Matco is a corporation with a principal place of business in Ohio . . . .").

[33] *See* http://media.corporate-ir.net/media_files/IROL/76/76792/Autozone_2017_Final_AR_web_ready.pdf

[34] *See* http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9MzczNTkyfENoaWxkSUQ9LTF8VHlwZT0z&t=1&cb=636270193262667361

[35] *See* https://www.sec.gov/Archives/edgar/data/93556/000009355617000006/swk_10k2016.htm

vague assertions of counsel that transfer to California will be more convenient for any party other than Launch USA.  "A transfer is not appropriate if the result is simply to shift the inconvenience from one party to another."  *Sullivan v. Tribley*, 602 F. Supp.2d 795, 800 (E.D. Mich. 2009).

Finally, Launch USA's motion must be denied because it provides no evidence that Launch China is subject to jurisdiction in California.[36]  Indeed, Launch China contends that it is not subject to the jurisdiction of any court in the United States.  Doc. 27 at 13, Pg. ID 495 (asserting "there is no other jurisdiction within which Launch China is amenable to personal jurisdiction").

### V.  Ford's FAC Alleges with Ample Specificity Factual Allegations Sufficient to Support All of Ford's Causes of Action.

Although Ford will address each of Defendants' arguments in detail, these arguments are essentially identical to those rejected by Judge Berg in the *Autel* Ligation.  In view of Launch China's participation in the *Autel* Litigation, Launch

---

[36] *See* Doc. 33 at 14, Pg ID 827 (admitting "the party seeking a transfer bears the burden of showing that jurisdiction and proper venue would exist in the District to which a transfer is requested"); *see also Hoffman v. Blaski*, 363 U.S. 335 (1960); *In re Fine Paper Antitrust Litigation*, 685 F. 2d 810, 819 (3rd Cir. 1982) ("*Hoffman* thus precludes transfer over a plaintiff's objections to a district in which venue would be improper as to a defendant who remained a party to the action"); *U.S. v. Edward Rose & Sons*, 246 F. Supp.2d 744, 756 (E.D. Mich. 2003) ("Defendants have failed to meet their threshold burden of proving that this action could have been brought against all of the named Defendants in [the transferee forum], short of their agreement to consent to jurisdiction.  Therefore, *Hoffman* is controlling and Defendants' motion must be denied.")

China is indisputably aware of Judge Berg's rulings. Launch China curiously does not reference Judge Berg's decisions or explain why this Court should reach the opposite conclusion of Judge Berg.

### a. Count 1 – Launch's Misappropriation of Ford's World-Famous Trademarks is Likely to Cause Confusion.

Defendants' arguments are notably devoid of citation to any authority holding dismissal is appropriate of an alleged infringer using a design logo trademark such as the FORD OVAL® on its products, its packaging, and its advertising. Moreover, such a position is contrary to established Sixth Circuit law that "mimicking the distinctive fonts of the marks go beyond using the marks 'as is reasonably necessary to identify' [Launch's product]." *Paccar v. Telescan Techs.*, 319 F.3d 243, 256 (6th Cir. 2003).

Defendants' arguments are founded primarily on disputing facts alleged in Ford's FAC. Such a strategy does not comport with the standard applicable to a Rule 12(b)(6) motion.[37] With regard to Launch China's use of the FORD OVAL® trademark on the iDiag App,[38] Launch China alleges, based solely on arguments

---

[37] *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) ("In reviewing a motion to dismiss, we construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff.")

[38] Doc. 16 at ¶ 86 ("Launch's iDiag 'app,' which Launch China made available via the Apple iTunes Store up through at least July 17, 2017, features the FORD OVAL® Trademark, as illustrated in Image 12.")

from counsel, that the apps are "the European versions, which show an image of the Ford logo"[39]—a dubious assertion given that the label "Ford USA" plainly appears under the FORD OVAL® trademark on the image of the iDiag App shown in Ford's complaint.  At a minimum, there is a factual dispute regarding the geographic scope of the iDiag App that must now be resolved in Ford's favor.

In addition, with regard to Launch China's use of the FORD OVAL® mark on the Diagun product, Launch China alleges the product is "a counterfeit version of Defendants' X-431 Diagun product no longer on the market, which has a depiction of the FORD name and logo on the electronic menu screen button alongside other carmakers."  It is well established that a defendant cannot avoid liability for infringement simply by changing the nature of its use of the plaintiff's mark.  In response to such an argument, the Third Circuit aptly stated:

> We are aware of no authority providing that a defendant's 'fair use' of a distinctive or famous mark only after the filing of a complaint alleging infringement can absolve that defendant of liability for his earlier unlawful activities.  Indeed, were there such authority we think it would be contrary to the orderly enforcement of the trademark and copyright laws.[40]

With regard to Launch's contention regarding the presence of the trademarks of "other carmakers," Judge Berg stated:

> Without prejudging Autel's arguments that its use of the Ford Oval, alongside the logos of other carmakers, on its menu screen bears only on the

---

[39] Doc. 27 at 28, Pg ID 499.
[40] *Shields v. Zuccarini*, 254 F.3d 476, 486 (3d Cir. 2001).

DS708's compatibility with different car manufacturers—and not on the DS708's source, the allegations in the Complaint are sufficient at this stage to support a reasonable inference of a likelihood of confusion arising from Autel's use of Plaintiffs' trademark.[41]

**b. Counts 2-4 – The Standard for Trademark Infringement is the Same as the Standard for False Designation of Origin.**

In *Two Pesos v. Taco Cabana*, the Supreme Court stated: "the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks. . . .  Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical—is there a 'likelihood of confusion?'" 505 U.S. 763, 780 (1992).  Accordingly, to the extent that Ford states a claim for trademark infringement, Ford also states a claim for false designation of origin under 15 U.S.C. § 1125(a).

Courts in this district have long recognized that the same Lanham Act analysis also applies to claims under Michigan common law (Count 3) and the Michigan Consumer Protection Act (Count 4).[42]  A defendant may be "liable for unfair competition under Michigan law based on the same activities which violate

---

[41] *Autel* Litigation, Doc. 24 at 21, Pg ID 235.

[42] *See, e.g., John Labatt Ltd. v. Molson Breweries,* 853 F. Supp. 965, 970 (E.D. Mich. 1994) ("The MCPA addresses in part the same policy as section 43(a) of the Lanham Act, and that policy is equally well served by allowing suit to be brought under the Act by business competitors"); *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc*., 502 F.3d 504, 520 (6th Cir. 2007) (standard under Michigan common law for unfair competition claim is the same as standard for federal trademark infringement and federal unfair competition).

the Lanham Act." *Microsoft Corp. v. Compusource Distribs., Inc.*, 115 F. Supp.2d

800, 807 (E.D. Mich. 2000).  In responding to the same arguments in the *Autel*

Litigation, Judge Berg simply stated:

> Having denied Autel's motion to dismiss Ford's federal trademark
> infringement claims, Autel's motion to dismiss Ford's state law trademark-
> related claims (Counts 5 and 6) IS DENIED for the same reasons, because
> Ford has plead sufficient facts to allege likelihood of confusion as to source.

*Autel* Litigation, Doc. 24 at 22, Pg ID 236.

### c. Count 5 – Launch's Use of Ford's World-Famous FORD OVAL® is an "Obvious Case" of Dilution Under Supreme Court Precedent.

A claim for dilution includes five elements: (1) the mark is famous, (2) the

mark is distinctive, (3) the defendant used the mark in commerce, (4) the

defendant's use began after the mark became famous, and (5) the defendant's use

is likely to cause dilution of the distinctive quality of the mark.[43]  Launch focuses

solely on the fifth element, which is established as a matter of law when identical

marks are used on similar goods.  In *Moseley v. V. Secret Catalogue*, the Supreme

Court stated: "direct evidence of dilution . . . will not be necessary if actual dilution

can reliably be proved through circumstantial evidence—the obvious case is one

where the junior and senior marks are identical."  123 S.Ct. 1115, 1125 (2003).[44]

---

[43] 15 U.S.C. § 1125(c)(1); *Audi AG v. D'Amato*, 469 F.3d 534, 547 (6th Cir. 2006).
[44] Courts have applied this presumption from *Moseley* even after the amendments
to 15 U.S.C. § 1125(c)(1).  *See Ford Motor Co. v. Heritage Mgmt. Grp.*, 911 F.

In addressing this argument in the *Autel* Litigation, Judge Berg held:

> Ford has adequately plead dilution because Autel's use of Ford's trademarks in its products could lead repairers to believe incorrectly that Ford's authorized software was contained in the MaxiDAS, thus blurring the mark's effectiveness as a unique identifier of Ford-manufactured products. Or, should the MaxiDAS fail to function properly in connecting to a Ford vehicle, a repairer seeing the Ford logo on the device might understandably assume that Ford was associated with the failure, thus tarnishing the mark by associating it with a lack of performance that should not be attributed to Ford.

In this case, the presence of the FORD OVAL® on Launch's products "could lead [purchasers of Launch's products] to believe incorrectly that Ford's authorized software was contained in [Launch's products], thus blurring the mark's effectiveness as a unique identifier of Ford-manufactured products."

### d. **Counts 6 and 7 – Ford's Complaint Alleges a Cause of Action for Misappropriation of Trade Secrets.**

Launch's arguments to dismiss Ford's trade secret claims are predicated on numerous assertions that are flatly contradicted by Ford's FAC. As set forth in the following table, Defendants' assertions are simply wrong.

---

Supp.2d 616, 629-30 (E.D. Tenn. 2012) ("Thus the chief question on this claim is whether Defendants caused 'dilution of the distinctive quality of Ford's mark.' However, with respect to this factor the Supreme Court has noted that 'direct evidence of dilution such as consumer surveys will not be necessary if actual dilution can reliably be proven through circumstantial evidence — the obvious case is one where the junior and senior marks are identical.'")

| Defendants' Arguments | Ford's FAC |
|---|---|
| "Plaintiffs also fail to allege that Plaintiffs took steps in order to protect the secrecy of that information."  Doc. 27 at 22, Pg ID 504. | 94. Certain compilations of data within the IDS System are made generally available pursuant to applicable federal statutes.  Other compilations of data within the IDS system, however, are not made publicly available and constitute trade secrets used by Ford and its network of authorized dealers and repair facilities.<br>95. One such compilation of data is referred to as the "FFData files."<br>96. Ford utilizes a variety of techniques, including encryption technology and obfuscation, to protect trade secret information included in the IDS System, such as the FFData files. |
| "Plaintiffs present no allegation that Launch China gained access to supposed confidential information by unlawful or improper means." Doc. 27 at 22, Pg ID 504.<br><br>"Plaintiffs fail to provide any factual content as to the 'who,' 'what,' 'when,' 'how,' or 'why' sufficient to establish an act of misappropriation." Doc. 27 at 22, Pg ID 504. | Heading G: "Launch Improperly Obtained Access to Ford's Confidential and Proprietary Information," preceding allegations in ¶¶ 170-180 and alleging Launch's use of PARSEALL.EXE constitutes "improper means."<br><br>Heading H. "Launch has Breached the End-User License Agreement Associated with Ford's IDS Software," preceding allegations in ¶¶ 181- 186 and alleging Launch's use of IDS violated the EULA and such violations constitute "improper means." |

27

| Defendants' Arguments | Ford's FAC |
|---|---|
| "Here, according to Plaintiffs, the alleged trade secret misappropriation occurred in 2012.  This is years before the enactment of the DTSA in 2016, and Plaintiffs identify no evidence of misappropriation against Launch China that began on or after 2016."  Doc. 27 at 35, Pg ID 506. | 162. The file titled Ford_99.H specifically refers to "ids104" on line 21.<br>163. The file titled Ford_99.H specifically refers to "ids100" on line 5596.<br>164. On information and belief, Ford alleges that the reference to "ids104" and "ids100" refer to specific versions of Ford's IDS software from which the files listed in Table 8, above, were obtained.<br>165. Version 100 of Ford's IDS software was released on April 13, 2016.<br>166. Version 104 of Ford's IDS software was released on February 1, 2017. |

Encryption of information, as alleged in Ford's FAC, is a reasonable step to protect trade secrets.[45]  Moreover, it is well established that trade secrets may "contain a mixture of secret information" and "non-secret information."[46]

Finally, Defendants' assert that "ETI merely provides another conduit that Ford apparently used to make its professed trade secrets broadly available."  Doc. 27 at 33, Pg. ID 504.  This assertion has no basis in Ford's FAC, and Defendants

---

[45] *In re Under Seal*, 749 F.3d 276, 280 (4th Cir. 2014) (recognizing SSL encryption used by Ford as "an industry-standard protocol" used by "many online companies"); *Aetna, Inc. v. Flugel*, 2008 Conn. Super. LEXIS 326, *14 (Conn. 2008) (noting "Aetna also goes to great lengths to protect its trade secrets" including use of "encryption to limit access to confidential information").

[46] *Mike's Train House, Inc. v. Lionel*, 472 F.3d 398, 410 (6th Cir. 2006) ("Several courts have followed the Seventh Circuit's decision in 3M…. As in 3M, the design drawings here are properly considered trade secrets even though they contain a mixture of secret information (e.g., dimensions, tolerances, and data-reference points) and non-secret information.").

do not provide any explanation for this claim other than the naked assertion of

Launch China's counsel.  This claim is unsupported, untrue, and contradicted by

Ford's FAC.  As such, it cannot be a basis of dismissal.

In addressing Autel's motion to dismiss Ford's trade secret claim, Judge

Berg ruled:

> Ford alleges that its IDS system contains some generally available
> compilations of data as well as others that are not publicly available and
> constitute trade secrets "used by Ford and its network of authorized dealers
> and repair facilities."  It alleges that the FFData is "one such compilation of
> data" and that Ford protects its IDS system trade secrets through encryption
> and obfuscation technology. . . .  Accepting Ford's allegations as true, the
> Court finds that Ford has adequately plead trade secret misappropriation.[47]

### e.  Count 8 – Ford's Complaint Alleges a Cause of Action for Copyright Infringement.

Launch's claims that Ford's claims are barred under the statute of limitations

are specious in view of the Doctrine of Separate Accrual:

> It is widely recognized that the separate-accrual rule attends the copyright
> statute of limitations.  Under that rule, when a defendant commits successive
> violations, the statute of limitations runs separately from each violation.
> Each time an infringing work is reproduced or distributed, the infringer
> commits a new wrong.  Each wrong gives rise to a discrete "claim" that
> "accrue[s]" at the time the wrong occurs.  In short, each infringing act starts
> a new limitations period.

*Petrella v. Metro-Goldwyn-Mayer*, 572 U.S. ____, 134 S. Ct. 1962, 1969 (2014).[48]

---

[47] Doc. 24 at 23, Pg ID 237.

[48] *See also* 3 M. Nimmer & D. Nimmer, Copyright § 12.05[B][1][b] ("If
infringement occurred within three years prior to filing, the action will not be

With regard to Defendants' arguments regarding the CALID_VIDQID_REC Copyright Registration, Ford specifically alleges "[t]he columns in the file named FORD_02.BIN [i.e., Launch's infringing file] correspond to and are in the same order as the CALID_VIDQID_REC registration." Doc. 16 at ¶ 110. Accordingly, Ford's FAC alleges that Launch copies the "selection, coordination, and arrangement of facts." Even under Defendants' own standard, Ford's complaint is sufficient. Doc. 27 at 26, Pg ID 508 ("Plaintiffs' alleged copyright in the compilation of data can only protect, at best, *the arrangement of data,* not the underlying data itself, which may be "freely copied.").

Ford further alleges that Launch copied fictitious data included in the CALID_VIDQID_REC Copyright Registration. Doc. 16 at ¶ 121. Ford puts fictitious data in its software to ensnare pirates such as Launch. Duplication of "common errors" and the presence of fictitious entries are among "the most persuasive proofs of copying, second only to direct evidence of copying." *Hayden v. Chalafant Press*, 281 F.2d 543, 548 (9th Cir. 1960).[49]

---

barred even if prior infringements by the same party as to the same work are barred because they occurred more than three years previously.").

[49] *See also Eckes v. Card Prices Update*, 736 F.2d 859, 863 (2d Cir. 1984) ("existence of common errors in two similar works" constitutes "strongest evidence of piracy"); *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 446 (4th Cir. 1986) (finding direct evidence of copying where defendants' program, like plaintiff's, included "a hidden legend that would appear only when the [program's] buttons were pressed in an abnormal sequence"); *Warren Publ'g v. Microdos Data,*

In responding to Autel's motion to dismiss Ford's copyright infringement claims, Judge Berg ruled:

> Ford alleges that Autel has copied the exact selection and arrangement of the Calid file because it claims that Autel's competing tool, the MaxiDAS, includes an "unlawfully obtained copy" of the Calid file. (Dkt. 28, p. 9). Ford claims that this copy is contained within Autel's "autel_01.tab" file. (Id.) Ford further alleges that a detailed analysis of Autel's file reveals that over 35,000 data entries are compiled in the same sequence and arrangement as Ford's Calid file. (Id. at pp. 14-22). The same is true for Ford's Mnemonics file. Ford alleges that Autel has copied "all or a substantial portion" of the text of the Mnemonics file, including the file's structure. (Id. at pp. 30-31.) The Court finds that Ford has plead sufficient facts to establish the second prong of copyright infringement.

In this case, Ford cannot provide the same level of detail because Defendants have refused to provide to Ford copies of the information made available for in-person review. Ford's pending motion for expedited discovery seeks production of Launch's data files. Launch's refusal to provide the request materials speaks to what the detailed analysis will show, when Ford's CALID Registration can be fully compared with Launch's file named FORD_02.BIN.

Ford notes—gratefully—that there is one element of Ford's FAC that Defendants do not contend is subject to dismissal, namely Ford's claims of infringement relating to Ford's Mnemonics registration.

---

52 F.3d 950, 955 (11th Cir. 1995) (inclusion of fictitious entries, "created as decoys," constitutes "strong evidence of copying), vacated, 115 F.3d 1509 (11th Cir. 1997) (denying protectability based on lack of authorship).

**f.  Count 9 – The EULA Governing Ford's IDS Software "Closes IDS's Door to Diagnostic Tool Manufacturers."**

As described above, Ford alleges specific facts supporting Ford's allegations that Launch USA and Launch China acted in concert to acquire Ford's IDS Software for use by Launch China.  These facts cannot be refuted for purposes of this motion.  The EULA provides that any "installation," "copying," and/or "use" of Ford's IDS Software entails an agreement to be bound by the EULA terms.[50]

Launch China makes no attempt to deny, and in fact seems to concede, that it utilizes Ford's IDS Software.  As a user of the IDS Software, the plain language of the EULA binds Launch China.  Launch China offers no authority for its claim that it is not bound because it contends that it did not directly acquire the software.

In addressing Autel's contention that the EULA cannot be enforced against a Chinese diagnostic tool manufacturer, Judge Berg stated:

> This argument is not well-taken.  The EULA's language prohibits diagnostic toolmakers from downloading the IDS in the first place.  In other words, it closes the IDS's doors to diagnostic toolmakers, it does not, as Autel's argument would suggest, offer competing diagnostic toolmakers free reign to access the IDS.  Autel's motion to dismiss Count Eight is DENIED.

Autel Litigation, Doc. 36 at 11, Pg ID 778.

---

[50] Doc. 16-19, Pg ID 318 ("YOU AGREE TO BE BOUND BY THE TERMS OF THIS EULA BY INSTALLING, COPYING, OR OTHERWISE USING THE PRODUCT.")

## VI.    **Conclusion.**

For the foregoing reasons, Plaintiffs respectfully request that the Court expeditiously deny Defendants' motions and take up Ford's pending motion for preliminary injunctive relief.

RESPECTFULLY SUBMITTED this 11th day of January 2018.

/s/ Gregory D. Phillips
Gregory D. Phillips (P80801)
Jared L. Cherry (P80800)
PHILLIPS RYTHER & WINCHESTER
600 East 124 South
Salt Lake City, Utah 84102
Attorneys for Plaintiff

33

**Certificate of Service**

I hereby certify that the foregoing document was electronically submitted on January 11, 2018, using the CM/ECF system, which will serve this document upon all counsel of record.

/s/ Jared L. Cherry