UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FORD MOTOR COMPANY and
FORD GLOBAL TECHNOLOGIES, LLC          Case No. 17-12906

        Plaintiffs,                              Honorable Nancy G. Edmunds

v.

LAUNCH TECH CO. LTD. and
LAUNCH TECH (USA), INC.

        Defendants.
_____/

**ORDER DENYING DEFENDANT LAUNCH TECH CO. LTD.'S MOTION TO DISMISS
[27]; DENYING DEFENDANT LAUNCH TECH (USA), INC.'S MOTION TO DISMISS
[33]; AND MOOTING DEFENDANT LAUNCH TECH CO. LTD.'S EMERGENCY
MOTION TO STAY [31]**

Plaintiffs Ford Motor Company and Ford Global Technologies, LLC (collectively

"Ford") bring this action against Defendants Launch Tech Co. LTD. ("Launch China") and

Launch Tech (USA), Inc. ("Launch USA") alleging trademark and copyright infringement,

false designation of origin, unfair and deceptive trade practices, trademark dilution,

misappropriation of trade secrets, and breach of contract.  Ford claims that Defendants

acted in concert to hack Ford's automobile-diagnostic software, copy Ford's proprietary

data compilations, and paste the proprietary data into Defendants' own competing

diagnostic software.  Ford further claims that Defendants infringed upon the world-famous

Ford trademarks, utilizing them in Defendants' diagnostic products and promotional

materials.

Currently before the Court are Defendants' motions to dismiss (Dkt. # 27; Dkt. # 33), which have been fully briefed.[1] The Court heard oral argument on the motions on February 15, 2018. Also before the Court is Launch China's Emergency Motion to Stay Briefing in Response to Plaintiffs' Motions for Preliminary Injunction and Expedited Discovery (Dkt. # 31) and Ford's response in opposition (Dkt. # 35).[2] For the reasons stated below, this Court DENIES Launch China's motion to dismiss, DENIES Launch USA's motion to dismiss, and MOOTS Launch China's motion to stay.

## I. FACTS

Ford is a Delaware corporation with its principal place of business in Dearborn, Michigan. Ford is a leading automobile manufacturer that also develops and sells automobile repair products. Specifically, Ford has developed the Ford Integrated Diagnostic System ("IDS"), a system which includes hardware and software used to diagnose Ford vehicles and facilitate their service and repair.

Defendant Launch China is a Chinese corporation having its principal place of business in Shenzhen, China. Launch China develops automobile diagnostic products and sells them throughout the world through third-party distributors.[3] One such distributor is

---

[1] In addition to the motions, response (Dkt. # 38), and replies (Dkt. # 41; Dkt. #45), the Court has also reviewed and considered the corrected Declaration of James Jiang filed by Launch China in support of its motion to dismiss (Dkt. # 37), the Appendix to Launch China's reply brief (Dkt. # 42), and the Declaration of James Jiang filed by Launch China along with its reply brief (Dkt. # 43).

[2] The Court has also reviewed and considered the Declaration of Deanna Kunze filed by Launch China in support of its motion to stay (Dkt. # 32).

[3] According to a declaration (submitted in a previous lawsuit) of James Jiang, Launch China's Executive Vice President, Launch China sells to two third-party distributors in the United States: Matco Tools and Launch USA. *See Ford Motor Co. et al. v. Autel US*

Defendant Launch USA, a California corporation having its principal place of business in Ontario, California. Launch USA purchases automobile diagnostic products from Launch China and distributes them throughout the United states via a network of distributors.[4]

According to Ford, Launch China develops the allegedly infringing automobile repair products at issue in this litigation. Ford points to a letter in which counsel for Launch USA represented to Ford that the products sold by Launch USA are "provided complete" by Launch China to Launch USA, and that Launch USA "has nothing to do with writing the software." *See* Dkt. # 16-5, Pg ID 247. Ford claims that Launch USA markets, sells, furnishes, and supports the allegedly infringing products throughout the United States, including in Michigan.[5] Alternatively, Ford claims that Launch China and Launch USA collaborate and develop the allegedly infringing products together. Ford alleges its agents have purchased Defendants' products at retail stores in Michigan.

According to the First Amended Complaint, "Launch Tech"[6] is a member of the Equipment and Tools Institute ("ETI"), a Michigan-based trade association with its principal place of business in Farmington Hills, Michigan. *See* Dkt. # 16-2, Pg ID 235. ETI gathers

---

*Inc. et al.*, No. 14-cv-13760, Dkt. # 66 at Pg ID 1865 (E.D. Mich. Sept. 21, 2016).

[4]The Launch USA website indicates that Launch USA uses a network of distributors to sell automobile diagnostic products throughout the country, including in Michigan. These distributors include Matco Tools, Napa Auto parts, Mac Tools, AutoZone, and Car Quest.

[5]According to the same James Jiang declaration, Launch USA provides repairs, warranty services, and software updates for Launch China's products and deals with end-users of Launch China's products. *See Autel*, Dkt. # 66 at Pg ID 1867.

[6]Ford notes that it is unclear whether ETI member "Launch Tech" is Launch USA or Launch China, since the names of both corporations begin with the terms "Launch Tech."

diagnostic information from original equipment manufacturers, such as Ford, and makes the information available to other manufacturers of diagnostic tools via its library for ETI members. Ford alleges that Harlan Siegel and John Marsh, Launch USA employees, are active participants in ETI and based in Michigan. *See* Dkt. # 16-3; Dkt. # 16-4. Ford claims that Launch China obtains diagnostic information relating to Ford vehicles from ETI's library to develop the allegedly infringing products. In the alternative, Ford alleges that Launch USA obtains diagnostic information relating to Ford vehicles from ETI's library and collaborates with Launch China to develop the allegedly infringing products.

Additionally, Ford alleges that a company identified as "L aunch"[7] has purchased at least one active version of Ford's IDS software since November 2013.[8] *See* Dkt. # 16-8. The contact information for "L aunch" indicates it is located at 1820 S Miliken Ave., Ontario, California (Launch USA's principal business address) and associated with Launch USA e-mail addresses. *See id.* In July 2017, Ford provided copies of the End-User License Agreements ("EULAs") applicable to various versions of the IDS software to counsel for Launch China, and noted that Ford believes Defendants are in violation of the EULAs, which expressly prohibit reverse engineering. *See* Dkt. # 16-19. The applicable EULA must be accepted by a user prior to installation and use of the IDS software. The EULAs

[7]Ford alleges that Defendants repeatedly inserted the space between the "L" and "a" in "L aunch" to ensure that Defendants could not be identified by a search for the term "Launch."

[8]Ford notes that "L aunch" purchased activation codes for Ford's IDS software and entered these activation codes during installation of the IDS software on "L aunch"'s computer systems to activate the IDS software using Ford's licensing server, which is located in Michigan. "L aunch" purchased the activation codes from Helm, Inc., a Ford vendor located in Michigan, and those purchases were processed on Helm, Inc.'s servers located in Michigan.

also provide that an "End-User" cannot be a "diagnostic toolmaker."  Ford alleges that Defendants acquired and utilized the IDS software despite being diagnostic toolmakers and violated the terms of the EULAs by engaging in reverse engineering.  In so doing, Launch China improperly obtained information relating to Ford's vehicles, which it then used to develop the allegedly infringing products at issue in this case.  In the alternative, Ford claims that Launch USA improperly obtained information relating to Ford's vehicles from the IDS software and collaborated and conspired with Launch China to develop the allegedly infringing products at issue in this case.[9]

According to the First Amended Complaint, Defendants acted in concert to hack Ford's IDS system.  The IDS software contains various compilations of data, some of which are made generally available pursuant to federal statutes, and some of which constitute trade secrets used by Ford and its network of authorized dealers and repair facilities.  Ford protects trade secret information included in the IDS software utilizing encryption and obfuscation technology.  Ford also has copyright registrations for several compilations of data included in the IDS software.

According to a declaration from Jared L. Cherry, counsel for Ford, Ford sent a demand letter to counsel for Launch China in July 2017 seeking production of information in an attempt to settle this dispute.  *See* Dkt. # 19, Pg ID 444.  On November 14, 2017, Defendants made available for Ford's review the underlying source code and data files that

---

[9]Ford further alleges that each Defendant was the agent, employee, partner, and/or joint venturer of the other Defendant; that each was acting within the course and scope of that relationship and with permission and consent of the other Defendant in committing the acts alleged in the First Amended Complaint; and that Defendants have acted in concert with each other in connection with Ford's allegations.

correspond to the products at issue.[10]  Ford claims it found precise references to 25 files contained in Ford's IDS software preceding data copied from those files; fictitious data records intentionally planted by Ford to ensnare hackers and then copied by Defendants from IDS; highly idiosyncratic expressions inapplicable to Defendants' products; programmer comments referring to the specific versions of IDS from which Defendants extracted data; and code that searches for and discards information associated with certain terms connected to fictitious data intentionally planted by Ford.   More specifically, Ford makes the following allegations based on information discovered during the source code review.

Ford has a copyright registration for the CALID_VIDQID_REC file, a data compilation included in the IDS software.  *See* Dkt. # 16-12.  Ford alleges that Defendants' products include an improperly obtained copy of Ford's CALID_VIDQID_REC file.  According to Ford, the code for the Launch X-431 V product includes multiple references to Ford's CALID_VIDQID_REC file, including a function called "SearchCALID_VIDQID_REC" within a file called "USAFORD_FILE.so."  Defendants' software also includes 21 files named FORD00.BIN through FORD_20.BIN which are found in several of Defendants' products. The file named FORD_02.BIN comprises multiple rows and columns, and the columns correspond to and are in the same order as Ford's CALID_VIDQID_REC file.  Column A7 in Ford's CALID_VIDQID_REC file includes fictitious records and is not distributed by Ford. Column A7 along with the fictitious records is also found in Defendants' FORD_02.BIN file.

---

[10]According to Ford, counsel for Launch China limited the source code review to one day and did not permit Ford to make copies of any materials.  Counsel for Ford created 21 screen captures during the source code review, which have remained in the possession of counsel for Launch China and have not been provided to Ford.

Ford, Launch China, and Launch USA were all involved in a prior lawsuit in which Ford alleged that the defendants, Autel US Inc. and Autel Intelligent Technology Co., Ltd., had copied Ford's CALID_VIDQID_REC file.[11]  Specifically, Ford alleged that Autel's copying was established by the presence of fictitious entries that included the terms "TEST" and "DUMMY."  In this case, Ford alleges that Defendants used information from the *Autel* litigation to better hide their acts of infringement and misappropriation.  Ford notes that Defendants produced a file called DiagReadFile.cpp during the source code review that searchers for and excludes records associated with the terms "TEST" and "DUMMY."

Ford also has a copyright registration for the MNEMONICS_ENG file, another data compilation included in the IDS software.  *See* Dkt. # 16-13.  Ford alleges that Defendants' products include an improperly obtained copy of Ford's MNEMONICS_ENG file.  According to Ford, the Launch X-431 V product displays text that is identical to specific entries in Ford's MNEMONICS_ENG file.  *See* Dkt. # 16-14.  Ford notes that Defendants produced a file called EN_TEXT.TXT during the source code review, which is incorporated into a file called USAFORD_EN.GGP.  Ford discovered three examples of idiosyncratic text present at the same frequency in both Defendants' EN_TEXT.TXT file and Ford's MNEMONICS_ENG file.  One example involves references to a "tick" button, which Ford's IDS Software incorporates.  Despite repeated references to a "tick" button in Defendants' EN_TEXT.TXT file, none of Defendants' products incorporate a "tick" button.  *See* Dkt. #

---

[11]Ironically, Ford traces the origins of the *Autel* ligation back to when James Jiang of Launch China and others contacted Ford in 2013 to offer evidence showing that Autel, one of Launch China's competitors, was violating Ford's intellectual property by extracting data from Ford's IDS software, which according to Launch China, provided Autel an unfair advantage.  *See* Dkt. # 16-16.

16, Pg ID 200-01. Ford alleges that the following products developed by Defendants include a file called USAFORD_EN.GGP: Launch X-431 Pro, Launch X-431 V, iDiag App, EasyDiag product, Diagun product, Creader Professional CRP129, and other products.

According to Ford, Defendants' products incorporate Ford's trade secrets in the form of specific files that constitute trade secrets owned by Ford that were copied in the files produced by Launch China during the source code review as specified in the First Amended Complaint.[12] *See* Dkt. # 16, Pg ID 203-04. Launch China produced a file called Ford_99.H, which specifically referred to "ids104" and "ids100." Ford alleges that these terms refer to the specific versions of Ford's IDS software from which the files were copied: version 100 and 104 of Ford's IDS software released on April 13, 2016 and February 1, 2017 respectively.

Another example of the alleged misappropriation of trade secrets involves Ford's Passive Anti-Theft System, which is accessed using security bytes and related algorithms. Ford alleges that these security bytes and related algorithms constitute Ford's trade secrets. Ford licenses certain third parties to use the security bytes and related algorithms pursuant to agreements requiring that they be maintained in strict confidence and outlining steps to protect the secrecy of the data. Ford has not licensed Defendants to use these security bytes and related algorithms, yet Defendants' products support features requiring access to the security bytes and related algorithms, such as key reprogramming and control of a vehicle's anti-lock braking module. Ford further alleges that Launch China has advertised the ability of its X-431 Pro and X-431 Pro 3 products to control the anti-theft key

---

[12]Ford alleges that it takes reasonable steps to maintain the secrecy of these files and imposes confidentiality obligations upon parties to which these files are disclosed.

matching method.  *See* Dkt. # 16, Pg ID 206.

Ford also alleges that Defendants created a program named PARSEALL.EXE, which is designed to obtain unauthorized access to data compilations within Ford's IDS software. Ford notes that, prior to the *Autel* litigation, James Jiang, Launch China's Executive Vice President, authored a document describing how the PARSEALL.EXE program accesses proprietary and confidential information stored in Ford's IDS software.  *See* Dkt. # 16, Pg ID 209-10; Dkt. # 16-16; Dkt. # 16-17; Dkt. # 16-18.  Ford claims that Defendants used PARSEALL.EXE to extract data from Ford's IDS software and copy it onto products sold by Defendants that are in direct competition with Ford's products.  In the alternative, Ford alleges that Defendants reversed engineered Ford's IDS software to extract confidential and proprietary information.

According to the First Amended Complaint, Ford has exclusive ownership of several trademark registrations for "Ford," "Ford Stylized," the "Ford Oval," and the "Lincoln Star" in the United States and worldwide.  *See* Dkt. # 16, Pg ID 183; Dkt. # 16-9.  Ford claims it has spent billions of dollars establishing considerable goodwill in these world-famous trademarks, which are recognized as symbols of high quality automotive goods and services.  Ford alleges that Defendants' products, web sites, and advertising materials misappropriate Ford's trademarks.  On January 3, 2012, Ford sent a cease and desist letter to Launch USA objecting to the use of the Ford Oval on Defendants' website and products. *See* Dkt. # 16-10, Pg ID 289.  Ford demanded that Launch USA delete any Ford trademarks from its website and any products and refrain from using Ford trademarks on advertising materials.  Launch USA signed and returned a copy of the cease and desist letter indicating its assent.

Nevertheless, Ford alleges that Defendants have continued to use Ford trademarks on products and advertising materials, breaching the cease and desist agreement. For example, in January 2015, US Customs and Border Protection detained a shipment of the Launch X-431 Diagun product because of the presence of the Ford Oval on the packaging and concerns that the product was a counterfeit because of its inferior quality. *See* Dkt. # 16-11. This product also displays the Ford Oval on the device and includes electronic images of the Ford Oval on a memory card included in the product. Ford claims that the X-431 V and X-431 Pro products also include electronic files of the Ford, Ford Stylized, Ford Oval, and Lincoln Star trademarks. *See* Dkt. # 16, Pg ID 186-89. Launch USA has also used the Ford Oval trademark on its website and promotional material. *See id.* at Pg ID 190. Launch China's iDiag app, which Launch China made available through the Apple iTunes Store through at least July 17, 2017, also features the Ford Oval trademark. *See id.* at Pg ID 191. Launch China made its iDiag app available through other app providers as well.

## II. ANALYSIS

Defendants move to dismiss for lack of personal jurisdiction, improper venue, and failure to state a claim upon which relief can be granted. In the alternative, Launch USA requests that the Court transfer this action to the Central District of California.

### A. Personal Jurisdiction

Defendants argue that the Court should dismiss this case because the Court lacks personal jurisdiction over Defendants. Defendants claim that they have not had any contact whatsoever with Michigan to create personal jurisdiction over them.

Ford responds that Defendants have engaged in numerous activities purposefully

directed toward Michigan that give rise to Ford's claims and subject Defendants to limited personal jurisdiction here.

Rule 12(b)(2) provides for a motion to dismiss for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). The party seeking to establish personal jurisdiction bears the burden of proving that the jurisdiction exists. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir.1991) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)). When deciding such a motion, the court may "determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Serras v. First Tennessee Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). The parties in this case have not requested preliminary discovery or an evidentiary hearing on the jurisdictional issues. Accordingly, the Court proceeds solely on the basis of the facts alleged in the pleadings, motions, and affidavits filed.

When a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, "the court must consider the pleadings and affidavits in the light most favorable to the plaintiff. To defeat such a motion, the plaintiff need only make a *prima facie* showing of jurisdiction. Furthermore, a court does not weigh the controverting assertions of the party seeking dismissal." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998) (citing *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996)).

Personal jurisdiction over a defendant is proper only if it comports with the requirements of the state long-arm statute and federal constitutional due process. *See CompuServe*, 89 F.3d at 1262. "Where the state long-arm statute extends to the limits of

the due process clause, the two inquiries are merged and the court need only determine whether exercising personal jurisdiction violates constitutional due process." *Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 477 (6th Cir. 2003).

The Michigan long-arm statute provides for limited personal jurisdiction over corporations who transact business in Michigan in cases arising out of such business transactions. M.C.L. § 600.715. Michigan's long-arm statute has been interpreted to bestow the broadest possible grant of personal jurisdiction consistent with due process. *See Audi AG & Volkswagon of Am., Inc. v. D'Amato*, 341 F. Supp. 2d 734, 741 (E.D. Mich. 2004). Accordingly, the Court need only determine whether exercising personal jurisdiction over Defendants violates constitutional due process. Even a single act by a defendant directed toward Michigan that gives rise to a cause of action can support a finding of minimum contacts sufficient to exercise personal jurisdiction without offending due process. *See Neal v. Janssen*, 270 F.3d 328, 331 (6th Cir. 2001).

The exercise of personal jurisdiction over a defendant is proper where the defendant has had certain minimum contacts with the forum such that the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1944). In determining whether a nonresident defendant has had sufficient contacts to support personal jurisdiction, three criteria apply:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).

**1. Have Defendants purposefully availed themselves of the privilege of acting in Michigan or causing a consequence in Michigan?**

The Supreme Court has found purposeful availment

> where the contacts with the forum state proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State. Thus, where the defendant 'deliberately' has engaged in significant activities within a state, or has created 'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and . . . it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985) (emphasis in original) (citations omitted). "Neither the presence of the defendant in the state, nor the actual contract formation need take place in the forum state for the defendant to do business in that state." *Lanier v. Am. Bd. of Endodontics*, 843 F.2d 901, 907 (6th Cir. 1988). "So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, [courts] have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Burger King Corp.*, 471 U.S. at 476.

Launch USA maintains that it has conducted no business whatsoever in Michigan. It asserts that it has no employees or agents in Michigan, and that it has no office, property, or accounts in Michigan. Launch USA claims that it does not direct marketing toward Michigan, that it has no distributor or retailer in Michigan, and that it has not sold any of the allegedly infringing products to anyone in Michigan.

According to the First Amended Complaint, Launch USA obtained and downloaded Ford's IDS software from Ford servers in Michigan by transacting business with Ford, a Michigan-based manufacturer, and then provided Ford's IDS software to Launch China in

order to develop the allegedly infringing products that Launch USA sells and profits from. According to Ford, Launch USA repeatedly reached into Michigan to buy licenses from Ford for Ford's IDS software, the software that is at the heart of Ford's claims in this case.[13] Ford also alleges that Launch USA distributes products incorporating the copyrights and trade secrets extracted from Ford's IDS software through a distribution network in Michigan. The infringing products are sold at retail stores in Michigan where Ford's agents have purchased them. Additionally, Ford alleges that Launch USA is a member of ETI, an industry trade association headquartered in Michigan that collects data from Ford and other Michigan-based automotive manufacturers and provides that information to diagnostic tool manufacturers for use in developing the products at issue in this case. Ford alleges that Launch USA shared that data with Launch China in order to develop the allegedly infringing products that Launch USA sells and profits from. Ford also claims that Launch USA has a vice president of automotive diagnostics located in the Greater Detroit Area. Launch USA also entered into a written agreement with Ford to cease and desist from infringement of Ford's trademarks. Launch USA entered this agreement with a Michigan-based company and should have reasonably foreseen that any breach would have consequences in Michigan.

Taking the above assertions as true, it is clear that Launch USA has taken actions that are intentionally directed toward Michigan, and that these actions are sufficient to constitute

---

[13]Launch USA claims that it is not a "diagnostic toolmaker" prohibited from downloading and activating the IDS software, but Ford alleges that Launch USA develops the Launch products together with Launch China. Ford also alleges that Launch USA is an active member of ETI, an organization for manufacturers of diagnostic tools.

minimum contacts with Michigan. *See CompuServe*, 89 F.3d at 1264-65; *Ford Motor Co. v. Autel US Inc.*, No. 14-13760, 2015 WL 5729067, at *11 (E.D. Mich. Sept. 30, 2015); *Serv. Sols. U.S., LLC v. Autel U.S. Inc.*, No. 13-10534, 2013 WL 5701063, at *4 (E.D. Mich. Oct. 18, 2013).

Launch China maintains that it has no activity in Michigan. It notes that it has no relationship with customers and solicits no sales in Michigan. Launch China also asserts that it is a completely separate company from Launch USA, and that Launch China has absolutely no control over Launch USA.

According to the First Amended Complaint, Launch China acted in concert with Launch USA to repeatedly obtain and download Ford's IDS software from Ford servers in Michigan by transacting business with Ford in Michigan. Ford alleges that Launch China accepted the terms of the EULAs governing Ford's IDS software and violated those terms by using reverse engineering to extract Ford's copyrights and trade secrets. According to Ford, Launch China directly sells diagnostic software products in Michigan that incorporate the copyrights and trade secrets extracted from Ford's IDS software, such as the Ford "vehicle line" for the Launch EasyDiag product, using Apple's iTunes Store and PayPal.[14] Ford also alleges that Launch China collects revenue from purchasers of the EasyDiag 2.0 product via PayPal for purchases of the "USA FORD" product line using the email address

---

[14]Contrary to Launch China's unsupported assertion, the fact that the PayPal China user agreement between PayPal China and Launch China contains a clause providing that disputes against PayPal China must be resolved by a court located in Singapore is of no import in this case, as that clause only applies to disputes between Launch China and PayPal China.

jiangbo.zhang@cnlaunch.com.[15]   Additionally, Launch China allegedly operates and interactive website[16] where Michigan residents who purchase Launch China's products may download software that incorporates the copyrights and trade secrets extracted from Ford's IDS software.[17]   Agents of Ford in Michigan have registered Defendants' products and downloaded software that is the subject of Ford's claims.[18]

Taking the above assertions as true, it is clear that Launch China has taken actions that are intentionally directed toward Michigan, and that these actions are sufficient to constitute minimum contacts with Michigan.  *See CompuServe*, 89 F.3d at 1264-65; *Autel*, 2015 WL 5729067, at *11; *Serv. Sols.*, 2013 WL 5701063, at *4.

In short, Defendants availed themselves of the privilege of acting in Michigan to obtain

---

[15]According to the First Amended Complaint, the user's manual for the Easy Diag series, available at Launch USA's website, notes the option to pay via PayPal for the "USA FORD" product line.

[16]According to the First Amended Complaint, Launch China is the registrant of the Internet domain x431.com.  *See* Dkt. # 16-6.  Ford alleges that users of the Launch X-431 V and X-431 Pro products must register at www.x431.com to utilize the products. Users in Michigan can access and download software, user manuals, and other materials for Defendants' products.

[17]Citing no authority in support of its position, Launch China argues this interactive website cannot constitute purposeful availment because users provide no mailing addresses.  The Court agrees with Ford that Launch China cannot avoid the possibility of being haled into court in jurisdictions where it directly sells allegedly infringing products based on Launch China's decision to be willfully blind to the location of its customers.

[18]*See Serv. Sols.*, 2013 WL 5701063, at *4 ("Autel ITC allegedly operates an interactive website which can be used first to register (allegedly infringing) products and then to download updates for them.  Such electronic 'updates' amount to digital instructions transmitted from Autel ITC to end users, in order to change software programming contained in various products, at least some of which are physically located in Michigan.  These contacts constitute additional, though unnecessary, plus factors supporting jurisdiction.") (citations omitted).

information from Ford, a manufacturer headquartered in Michigan, that Defendants then used in the development of the allegedly infringing products that compete with Ford's products and that Defendants sell in Michigan and allegedly profit handsomely from. Indeed, according to Ford, Defendants have generated millions of dollars in revenue from just one of the products at issue. Viewing the facts in the light most favorable to Ford, it is evident that Launch USA and Launch China themselves took actions that created connections with Michigan, and the Court fins that the connections are substantial enough that Launch USA and Launch China should reasonably have anticipated being haled into a Michigan court.

### 2. Do Ford's claims arise from Defendants' activities in Michigan?

In order to find the exercise of jurisdiction over Defendants proper, the Court must also find that Ford's claims against Defendants arise from Defendants' activities in Michigan. "If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts." *CompuServe*, 89 F.3d at 1267 (citations omitted).

The claims in this case concern allegations of trademark and copyright infringement, false designation of origin, unfair and deceptive trade practices, trademark dilution, misappropriation of trade secrets, and breach of contract. Accepting Ford's contentions as true, Launch USA's contacts with Michigan and Launch China's contacts with Michigan are plainly related to the operative facts of this controversy. Ford claims that Launch USA and Launch China acted in concert to improperly extract proprietary data from Ford's servers in Michigan in order to develop the allegedly infringing products at issue in this case. These products were intended to be used on Ford vehicles manufactured in

Michigan. Ford also alleges that Launch USA and Launch China infringed upon Ford's trademarks using them in their own promotional materials and products that are sold in Michigan, and that proceeds of those sales flowed to Launch USA and Launch China through Michigan. Viewing the facts in the light most favorable to Ford, the Court finds that Ford has satisfied the "arising from" requirement.

**3. Do the acts of Defendants or consequences caused by Defendants have a substantial enough connection with Michigan to make the exercise of jurisdiction over Defendants reasonable?**

Where the Court finds, as it has in this case, that the purposeful availment and "arising from" requirements are met, then an inference arises that the reasonableness requirement is also present. *CompuServe*, 89 F.3d at 1268 (citations omitted). "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477.

The Court finds that Launch USA and Launch China have failed to demonstrate how jurisdiction in Michigan would be fundamentally unfair. Launch USA claims that litigating in Michigan would be burdensome because Launch USA is a small company that does not reside or conduct business in Michigan. Launch China claims that litigating in Michigan would be burdensome because Launch China is a Chinese company with no contacts in Michigan. Despite Defendants' assertions, viewing the facts in the light most favorable to Ford, Defendants did transact business in Michigan, as discussed above. It is not unfair to require a corporate defendant to defend against trademark and copyright infringement,

false designation of origin, unfair and deceptive trade practices, trademark dilution, misappropriation of trade secrets, and breach of contract claims arising from their contacts with Michigan.

Additionally, Michigan has a strong interest in protecting its residents from unfair competition, theft of trade secrets, and trademark and copyright violations. Ford also has a strong interest in litigating this case in Michigan. The Court concludes that the exercise of jurisdiction over Defendants is reasonable.

Ford has presented a *prima facie* case that the Court has personal jurisdiction over Launch USA and Launch China. Defendants' motions to dismiss for lack of personal jurisdiction are denied.

**B. Venue**

Defendants next argue that the Court should dismiss this case because the Eastern District of Michigan is not a proper venue. Defendants argue that no part of the events giving rise to Ford's claims occurred in this district because Defendants have conducted no business in this district, relying on their arguments that this Court cannot exercise personal jurisdiction over Defendants. Defendants further argue that venue is improper in this district because venue in a copyright action is restricted to a defendant's state of incorporation.

Ford responds that venue is proper under both 28 U.S.C. § 1391 and 28 U.S.C. § 1400 because Defendants are amendable to personal jurisdiction in this district, and because a substantial part of the events giving rise to Ford's claims occurred in this district.

Rule 12(b)(3) of the Federal Rules of Civil Procedure provides for a motion to dismiss

for improper venue. Fed. R. Civ. P. 12(b)(3). In general, venue is proper in (1) a judicial district where any defendant resides, if all of the defendants reside in the same state; (2) a judicial district where a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated; or (3) a judicial district where any defendant is subject to the court's personal jurisdiction with respect to the action, if there is no other district in which the action may be brought. 28 U.S.C. § 1391(b); *see Bunting ex rel. Gray v. Gray*, 2 Fed. App'x 443, 448 (6th Cir. 2001). Venue may be proper in more than one judicial district under Section 1391. *Overland, Inc. v. Taylor*, 79 F. Supp. 2d 809, 811 (E.D. Mich. 2000). In cases with multiple defendants, venue must be proper with respect to all defendants. *See IA, Inc. v. Thermacell Techs., Inc.*, 983 F. Supp. 697, 700 (E.D. Mich. 1997).

If an objection to venue is raised, the plaintiff bears the burden of establishing that venue is proper. *Overland*, 79 F. Supp. 2d at 811. "The Court may examine facts outside the complaint but must draw all reasonable inferences and resolve factual conflicts in favor of the plaintiff." *Audi AG & Volkswagen of Am., Inc. v. Izumi*, 204 F. Supp. 2d 1014, 1017 (E.D. Mich. 2002). "If a defendant prevails on a Rule 12(b)(3) challenge, the Court has the discretion to decide whether the action should be dismissed or transferred to an appropriate court." *Id.*; *see* 28 U.S.C. § 1406.

The Sixth Circuit has held that a plaintiff may file his complaint in any forum where a substantial part of the events or omissions giving rise to the claim arose, which "includes any forum with a substantial connection to the plaintiff's claim." *First of Michigan Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998). "The 'substantial part' standard does not require that a majority of the acts or omissions giving rise to a plaintiff's claim occur in the

venue chosen by the Plaintiff." *Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 946 F. Supp. 2d 714, 724 (E.D. Mich. 2013) (citing *Bramlet*, 141 F.3d at 263).

Here, a "substantial part" of the events giving rise to Ford's claims are alleged to have occurred in the Eastern District of Michigan. For example, Launch USA's and Launch China's alleged hacking of Ford's IDS software gives rise to Ford's claims of copyright infringement, misappropriation of trade secrets, and breach of the applicable EULAs. As discussed above, Ford alleges that Launch USA and Launch China acted in concert to improperly download the software from servers located in this district by transacting business with Ford, a manufacturer located in this district. Ford further alleges that Launch USA and Launch China acted in concert to develop the allegedly infringing products incorporating Ford's copyrights, trademarks, and trade secrets that Launch USA sells in this district through its distributors and that Launch China sells in this district through app stores and PayPal. These sales give rise to Ford's claims of trademark infringement, trademark dilution, and unfair and deceptive trade practices. These allegedly tortious or unlawful actions occurred in this district, and Ford has sufficiently alleged that harms resulting from these actions are felt in this district. Drawing all reasonable inferences and resolving factual conflicts in favor of Ford, the Court concludes that venue is proper in this district.

As to the copyright claim, venue in a copyright case is governed by 28 U.S.C. § 1400(a), which provides: "Civil actions, suits, or proceedings arising under any Act of Congress relating to copyright or exclusive rights in mask works or designs may be instituted in the district in which the defendant or his agent resides or may be found." "The general rule of construction of § 1400(a) is that a defendant or his agent 'may be found' in any district in which he is amendable to personal jurisdiction, or wherever he may validly

21

be served with process." *Mihalek Corp. v. State of Mich.*, 595 F. Supp. 903, 907 (E.D. Mich. 1984), *aff'd,* 814 F.2d 290 (6th Cir. 1987). This Court has already determined it has personal jurisdiction over Launch USA and Launch China. Therefore, Launch USA and Launch China "may be found" in this district, and venue is proper as to Ford's copyright claim.

Defendants' reliance on *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514 (2017) is misplaced. In that case, the Supreme Court held that a domestic corporation "resides" only in its state of incorporation for purposes of the *patent* venue statute, 28 U.S.C. § 1400(b) ("Any civil action for *patent* infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement *and has a regular and established place of business.*") (emphasis added). *TC Heartland*, 137 S. Ct. at 1521. The copyright subsection of the statute, section 1400(a) quoted above, provides a less restrictive venue standard than the patent subsection, section 1400(b). The holding in *TC Heartland* is limited to section 1400(b), and the Supreme Court did not at all discuss section 1400(a). Following the *TC Heartland* decision, courts in this district continue to interpret the broader "may be found" language of section 1400(a) applicable to copyright claims to mean any district where a defendant is subject to personal jurisdiction. *See, e.g.*, *Conceivex, Inc. v. Rinovum Women's Health, Inc.*, No. 15-CV-14239, 2017 WL 3484497, at *5 (E.D. Mich. Aug. 15, 2017).

Defendants' motions to dismiss for improper venue are denied.

## C.  Launch USA's Motion to Transfer

In the alternative, Launch USA argues that this Court should transfer this case to the Central District of California.

Ford responds that such a transfer would only benefit Launch USA, and that Launch USA has failed to establish that fairness and practicality strongly favor a transfer.

Even if venue is proper, a district court has wide discretion to transfer a case pursuant to 28 U.S.C. § 1404(a). Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." In resolving motions to transfer venue, courts consider factors such as the convenience of the parties and witnesses, accessibility of evidence, availability of process to make reluctant witnesses testify, costs of obtaining willing witnesses, practical problems of trying the case most expeditiously and inexpensively, and the interests of justice. *See Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009). "The movant carries the burden of showing that once all the relevant factors are scrutinized, fairness and practicality strongly favor the forum to which transfer is sought." *Rowe v. Chrysler Corp.*, 520 F. Supp. 15, 16 (E.D. Mich. 1981). Absent such a showing, the plaintiff's choice of forum should rarely be disturbed. *See Reese*, 574 F.3d at 320. "A transfer is not appropriate if the result is simply to shift the inconvenience from one party to another." *Sullivan v. Tribley*, 602 F. Supp. 2d 795, 800 (E.D. Mich. 2009).

Regarding the convenience of the parties, Launch USA argues that it is a small company based in Ontario, California subject to personal jurisdiction in the Central District of California. However, as discussed above, Launch USA is also subject to personal jurisdiction in the Eastern District of Michigan. The other parties to this action, Launch China and Ford, are not located in California. Here, Ford chose a forum to which it is strongly connected, and the Court finds that Ford's choice of forum is entitled to substantial

deference.  *See Audi AG & Volkswagon of Am., Inc. v. D'Amato*, 341 F. Supp. 2d 734, 750 (E.D. Mich. 2004).

Regarding the convenience of witnesses, Launch USA vaguely asserts that "[t]he location of many of the anticipated third-party witnesses (Launch USA's importer, distributors, or accountants) are likewise located in California."  On a motion to transfer venue, "[t]he moving party should generally provide each witness's name and the subject matter of the witness's anticipated testimony."  *Id.*  Ford notes that Launch USA has repeatedly argued that it has little if any information relevant to the substance of this action, maintaining that it has nothing to do with writing the software contained in the allegedly infringing products.  Launch USA focuses on some of its witnesses, yet there is no suggestion that Launch China's witnesses or Ford's witnesses are located in California. Launch USA has not shown that the convenience of witnesses factor weighs in favor of transfer.

Regarding the accessibility of evidence, Launch USA asserts that "[a] significant majority of the physical evidence in this case is located in the Central District of California." Launch USA focuses on its own records, yet the evidence in this case will also include Launch China's records and Ford's records, which are not located in California.  In any event, "the location of documentary evidence is a minor consideration."  *See United States v. Cinemark USA, Inc.*, 66 F. Supp. 2d 881, 890 (N.D. Ohio 1999) (internal quotation marks and citation omitted).  Launch USA has not shown that this factor weighs in favor of transfer.

Regarding availability of process to make reluctant witnesses testify and cost of obtaining willing witnesses, Launch USA again fails to specifically identify any key

witnesses that may present issues.  Instead, Launch USA vaguely asserts that some of the individuals that Ford may want to call at trial reside in California, and that Launch USA "may or may not require the testimony of Ford personnel."  Launch USA further asserts, without any mention of Ford's witnesses or Launch China's witnesses, that the cost of procuring willing witnesses who reside in California will be lower if the trial takes place in California.  This is insufficient to meet Launch USA's burden.

Regarding practical problems of trying the case most expeditiously and inexpensively, Launch USA asserts, without any support, that most of the third-party witnesses and much of the physical evidence is located in California.  Again, Launch USA fails to identify any key witnesses by name, and points to no physical evidence outside of its own records.  In addition, Launch USA notes that this case can be tried faster in the Central District of California than in this district, based on 2016 data indicating that "the median time interval in months for 'Total Cases' was 8.4 months for this District Court and only 4.9 months for the Central District of California."  Launch USA has not shown that this factor weighs in favor of transfer.

Regarding the interests of justice, as discussed above, a substantial part of the events giving rise to Ford's claims are alleged to have occurred in the Eastern District of Michigan. "A fundamental principle . . . is that litigation should proceed in that place where the case finds its center of gravity."  *D'Amato*, 341 F. Supp. 2d at 751.  The Court also notes that Launch USA has not shown that this action could have been brought in the Central District of California, as it has not shown that Launch China is subject to jurisdiction in the Central District of California.

The Court concludes that Launch USA has failed to meet its burden of showing that

fairness and practicality strongly favor a transfer to the Central District of California.  In short, Launch USA seemingly seeks to shift the inconvenience from one party to another, which is not appropriate.  Launch USA's motion to transfer is denied.

### D.  Failure to State a Claim

Finally, Launch China moves to dismiss on the ground that Ford has failed to state a claim upon which relief can be granted, and Launch USA joins in this motion relying on Launch China's arguments.

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for a motion to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Directv Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  A court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Bell Atl. Corp. v. Twombly,*  550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted).

Under the Supreme Court's heightened pleading standard laid out in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "a complaint only survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Estate of Barney v. PNC Bank, Nat'l Assoc.,* 714 F.3d 920, 924 (6th Cir. 2013) (internal quotation marks and citations omitted).  The Sixth Circuit has explained that, "[a] claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks and citations omitted).  Furthermore, while "[t]he plausibility standard is not

26

akin to a 'probability requirement,' [] it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). If the plaintiffs do "not nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

The court primarily considers the allegations in the complaint, and "documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)). Additionally, "[a] court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." *Id.* at 336. Documents not attached to the pleadings may also be considered part of the pleadings when the "document is referred to in the complaint and is central to the plaintiffs' claim.*" Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999) (internal quotation marks and citation omitted).

### 1. Claim 1: Federal Trademark Infringement and Counterfeiting under 15 U.S.C. § 1114

Defendants argue that Ford's trademark infringement claim fails because Ford cannot show that Defendants used any Ford trademark in commerce, or that Defendants' use of any Ford trademark was likely to cause confusion.

Ford responds that it has sufficiently alleged facts establishing a trademark infringement claim at this stage, and that Defendants' arguments are improperly founded

on disputing the facts alleged in Ford's First Amended Complaint.

"To state a claim for trademark infringement under the Lanham Act, a plaintiff must allege facts establishing that: (1) it owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009).

Regarding the second element, Ford has sufficiently alleged that Defendants used Ford's trademarks in commerce. *See, e.g.*, *Lorillard Tobacco Co. v. Van Dyke Liquor Mkt., Inc.*, 471 F. Supp. 2d 822, 832 (E.D. Mich. 2007) (finding that the sale of any counterfeit cigarettes hindered the plaintiff's ability to conduct interstate cigarette sales, and thus, it affected interstate commerce). According to Ford, Defendants sell the allegedly infringing products throughout the United States, and agents of Ford have purchased these products at retail stores in Michigan. Defendants merely assert that Ford cannot show that Launch China "used the mark in commerce" because the Launch X-431 V has never been sold to Launch USA for resale in the United States, and because Launch China discontinued the Launch X-431 Diagun in 2012 after counterfeiting problems arose. These, however, are factual disputes that the Court must resolve in Ford's favor at this stage.[19] In any event, Ford also alleges that Defendants have used Ford's trademarks on advertising materials, web sites, and in other products such as the X-431 Pro and the iDiag app. Ford further alleges that US Customs and Border Protection detained a shipment of the X-431 Diagun

---

[19]The Court notes that Launch China allegedly also sells diagnostic products to Matco Tools for resale in the United States. Further, Defendants have provided no authority for the proposition that discontinuing infringing products only after counterfeiting concerns arise can absolve Defendants of liability for any earlier unlawful use of Ford's trademarks. *See Shields v. Zuccarini*, 254 F.3d 476, 486 (3d Cir. 2001).

product because of the presence of the Ford Oval on the packaging, and that this product displays the Ford Oval on the device and includes electronic images of the Ford Oval on a memory card included in the product. Launch China asserts that this product is a counterfeit not manufactured or distributed by Launch China, but again, that is a factual dispute that the Court must resolve in Ford's favor at this stage.

As to the likelihood of confusion element, "[t]he touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997). "In addition to point-of-sale confusion, the Sixth Circuit recognizes that a likelihood of downstream confusion, also called 'post-sale' confusion, is actionable." *Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 356 (6th Cir. 2006).

Launch China maintains that Ford has failed to establish likelihood of confusion because Ford has not identified infringing products "currently manufactured or distributed by Launch China in the United States." In support, Launch China merely asserts that the First Amended Complaint refers to "a counterfeit version of Defendants' X-431 Diagun product no longer on the market," and to "Launch China's EasyDiag 2.0 and iDiag applications, the European versions." However, Ford has specifically alleged that Defendants' web sites, advertising materials, and products—namely, the X-431 Diagun, X-431 V, X-431 Pro, and iDiag app—contain images on the packaging and/or electronic images that mimic the distinctive fonts and shapes of Ford's trademarks.[20] For example,

---

[20]The Sixth Circuit has noted that there is no logical reason for "precise copying save an attempt to realize upon a secondary meaning that is in existence." *Ferrari S.P.A. v.*

the First Amended Complaint includes an image of the iDiag App showing the words "USA FORD" under a Ford Oval image. *See* Dkt. # 16, Pg ID 191. The Court agrees with Ford that, at minimum, there are factual disputes regarding the geographic scope of the various products at various times, which must be resolved in Ford's favor at this time. The Court concludes that Ford has sufficiently alleged that Defendants' use of Ford's trademarks is likely to cause confusion.

Launch USA argues that Ford's trademark-based claims fail because Ford has merely alleged non-trademark use of a trademark or classical fair use. Launch USA notes that Ford has merely alleged that its trademark is displayed on the screen of diagnostic tools as part of a long list of automobile manufacturers, which a customer would not see until well after the customer has bought the product.[21]

"Under the doctrine of 'fair use,' the holder of a trademark cannot prevent others from using the word that forms the trademark in its *primary* or *descriptive* sense." *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 319 (6th Cir. 2001) (emphasis in original). "In evaluating a defendant's fair use defense, a court must consider whether defendant has used the mark: (1) in its descriptive sense; and (2) in good faith." *ETW*

---

*Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991) (internal quotation marks and citation omitted).

[21]Launch USA focuses exclusively on likelihood of confusion at the point of purchase, but as noted above, the Sixth Circuit recognizes that a likelihood of downstream confusion is also actionable. *See Keystone*, 453 F.3d at 356, 358 ("Even without point-of-sale confusion, knockoffs can harm the public and the original manufacturer in a number of ways, including: . . . consumers desiring high quality products may be harmed if the original manufacturer decreases its investment in quality in order to compete more economically with less expensive knockoffs . . .[; and] the original manufacturer's reputation for quality may be damaged if individuals mistake an inferior counterfeit for the original . . . .").

*Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 920 (6th Cir. 2003). Some possibility of consumer confusion is compatible with fair use. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121 (2004).

In *Autel*, Ford alleged, as it does in this case, that the defendants were actually using Ford's trademarked logo with its distinctive shape, color, and lettering on the defendants' packaging, advertising, web sites, and on the products' menu screens. *See Autel*, 2015 WL 5729067, at *9. The court in *Autel*, found that the allegations in the complaint were sufficient to support a reasonable inference of a likelihood of confusion arising from the defendants' use of Ford's trademarks. The court noted that—without prejudging the defendants' arguments that their use of the Ford Oval alongside the logos of other automobile manufactures did not create confusion as to the product's source and constituted fair use—it could not resolve the factual question of fair use from a review of the pleadings alone. *See id.* The Court reaches the same conclusion in this case; the Court cannot determine at this stage whether Defendants' use of Ford's trademarks constitutes fair use as a matter of law.

Defendants' motions to dismiss Ford's trademark infringement claim are denied.

**2. Claims 2-4: False Designation of Origin under 15 U.S.C. § 1125(a); Unfair Competition under Michigan Common Law; and Violation of the Michigan Consumer Protection Act, M.C.L. § 445.903**

Defendants argue that Ford's false designation of origin claim, unfair competition under Michigan common law claim, and violation of the Michigan Consumer Protection Act claim fail because Ford has not sufficiently alleged that Defendants' use of Ford's

trademarks is likely to cause confusion. Defendants rely on the same arguments discussed above.

The Supreme Court has explained that, "[u]nder the Lanham Act § 43(a), the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks. Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical—is there a 'likelihood of confusion?'" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992) (Stevens, J., concurring) (internal quotation marks and citation omitted). The Michigan Consumer Protection Act ("MCPA") addresses in part the same policy as Section 43(a) of the Lanham Act. *John Labatt Ltd. v. Molson Breweries*, 853 F. Supp. 965, 970 (E.D. Mich. 1994). The standard under the MCPA and under Michigan common law for an unfair competition claim is the same as the standard for federal trademark infringement and federal unfair competition: whether confusion is likely. *Goscicki v. Custom Brass & Copper Specialties, Inc.*, 229 F. Supp. 2d 743, 756 (E.D. Mich. 2002); *Microsoft Corp. v. Compusource Distribs., Inc.*, 115 F. Supp. 2d 800, 803 (E.D. Mich. 2000).

Given that the standard is the same for these claims as for the trademark infringement claim discussed above, and given that Defendants rely on the same arguments discussed above, the Court concludes that Defendants' arguments fail for the same reasons discussed above. The allegations in Ford's First Amended Complaint are sufficient to support a reasonable inference of a likelihood of confusion arising from Defendants' use of Ford's trademarks. Defendants' motions to dismiss Ford's false designation of origin

claim, unfair competition under Michigan common law claim,[22] and violation of the MCPA claim are denied.

### 3.  Claim 5:  Trademark Dilution under 15 U.S.C. § 1125

Relying on the same arguments discussed above, Defendants argue that Ford's trademark dilution claim fails because Ford cannot show that Defendants' use of Ford's trademarks caused dilution of the distinctive qualities of Ford's trademarks.

Ford responds that this element is established as a matter of law when identical marks are used on similar goods as alleged in this case.

To state a claim for trademark dilution, a plaintiff must allege facts establishing that its trademark is (1) famous and (2) distinctive, and that the defendant's use of the mark (3) was in commerce, (4) began after the plaintiff's mark became famous, and (5) caused dilution of the distinctive quality of the plaintiff's mark.  *Audi AG v. D'Amato*, 469 F.3d 534, 547 (6th Cir. 2006).  The Supreme Court has observed that dilution can be shown through circumstantial evidence—"the obvious case is one where the junior and senior marks are identical."  *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 434 (2003).

The Court has already rejected Defendants' arguments above.  The Court finds that Ford has adequately pled dilution because Defendants' use of Ford's trademarks in its products could lead the users of diagnostic tools to believe incorrectly that Ford's

---

[22]Regarding Ford's unfair competition claim under Michigan common law, Defendants also argue that the claim fails because Ford failed to identify a mark registered under Michigan's unfair competition statute, M.C.L. § 429.42.  This argument misses the mark because Ford did not allege a violation of Michigan's unfair competition statute.  Rather, Ford has brought an unfair competition claim under Michigan common law.  A plaintiff may choose to bring either or both of these claims.  *See, e.g.*, *Council on Am.-Islamic Relations Action Network, Inc. v. Schlussel*, No. 11-10061, 2011 WL 3563290, at *7 (E.D. Mich. Aug. 11, 2011); *Lorillard Tobacco*, 471 F. Supp. 2d at 832.

authorized IDS software is contained in the Launch diagnostic tools, blurring the effectiveness of Ford's trademarks as unique identifiers of Ford products, including Ford's own diagnostic tools.  Further, should one of the allegedly infringing Launch products fail to function properly while diagnosing a Ford vehicle, a user seeing the Ford Oval on the Launch device might assume that Ford was associated with the malfunction, tarnishing Ford's trademark by associating it with a failure to perform or low quality that should not be attributed to Ford.  *See Ford Motor Co. v. Autel US Inc.*, No. 14-13760, 2016 WL 3569541, at *5 (E.D. Mich. July 1, 2016) (reaching the same conclusion in the prior *Autel* litigation).

Defendants' motions to dismiss Ford's trademark dilution claim are denied.

### 4.  Claims 6-7:  Misappropriation of Trade Secrets under Michigan Law; and Misappropriation of Trade Secrets under 18 U.S.C. § 1836, *et seq.*

Defendants argue that Ford's misappropriation of trade secrets claims should be dismissed because the First Amended Complaint is "devoid of any specific allegation regarding a 'trade secret' or 'misappropriation.'"  Defendants note that Ford's IDS software is available to the public through subscriptions and through ETI, and that Ford granted a subscription to this information to Launch USA.  Defendants also argue that Ford has failed to allege that it took steps in order to protect the secrecy of the alleged trade secrets.  Defendants maintain that Ford has also failed to allege that Launch China gained access to any confidential information by unlawful or improper means, and that reverse engineering is not actionable as trade secret misappropriation.  Defendants also argue that Ford's federal claim cannot survive because the alleged misappropriation occurred years before the enactment of the Defend Trade Secrets Act.

Ford responds that Defendants' assertions are flatly contradicted by the First

Amended Complaint.  The Court agrees.

To state a claim for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), a plaintiff must allege facts establishing an unconsented disclosure or use of a trade secret by one who used improper means to acquire the secret; or, at the time of the disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret.  *See* 18 U.S.C. § 1839(5).

The Michigan Uniform Trade Secrets Act ("MUTSA") defines "trade secret" as follows:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:

(i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

M.C.L. § 445.1902(d).  Michigan courts look to the following factors to determine whether information constitutes a trade secret:

(1) extent to which information is known outside of owner's business, (2) extent to which information is known by employees and others involved in business, (3) extent of measures taken to guard secrecy of information, (4) value of information to owners and competitors, (5) amount of effort and money expended in developing information, and (6) ease or difficulty with which information could be properly acquired or duplicated by other.

*Dura Glob. Techs., Inc. v. Magna Donnelly Corp.*, 662 F. Supp. 2d 855, 859 (E.D. Mich. 2009) (internal quotation marks and citations omitted).

The MUTSA defines "misappropriation" as follows:

"Misappropriation" means either of the following:

(i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(ii) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

(A) Used improper means to acquire knowledge of the trade secret.

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.

(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

M.C.L. § 445.1902(b).

Ford alleges that its IDS software contains various compilations of data, some of which are made generally available (for example through the ETI library), and some of which are not made available and constitute trade secrets used by Ford and its network of authorized dealers and repair facilities. Ford alleges that it protects trade secret information included in the IDS software, such as the FFData files, utilizing encryption and obfuscation technology. According to the First Amended Complaint, Ford also licenses certain third parties to access certain data compilations pursuant to agreements requiring that data be maintained in strict confidence and outlining steps to protect the secrecy of the data. Additionally, Ford requires that a purchaser of IDS agree to a EULA prohibiting reverse engineering and use by another diagnostic toolmaker. The Sixth Circuit has held that when materials are trade secrets based on a unique combination of both secret and non-secret information, a plaintiff is not required to identify which components of the

protected material is secret. *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 411 (6th Cir. 2006). Additionally, courts have recognized encryption of data as an industry-standard protocol used by many companies. *See, e.g.*, *In re Under Seal*, 749 F.3d 276, 280 (4th Cir. 2014). Construing the First Amended Complaint in the light most favorable to Ford, the Court finds that Ford has sufficiently alleged that the information at issue consists of trade secrets, and that Ford took reasonable efforts to maintain their secrecy.

Ford also alleges that Defendants gained access to Ford's confidential and proprietary information through improper means. In particular, Ford alleges that Defendants created a program named PARSEALL.EXE, which is designed to obtain unauthorized access to data compilations within Ford's IDS software. According to Ford, Defendants used PARSEALL.EXE to extract data from Ford's IDS software and copy it onto products sold by Defendants. Additionally, Ford alleges that Defendants purchased and installed IDS, and agreed to and violated the terms of the EULAs prohibiting activation by diagnostic toolmakers as well as reverse engineering. The Court finds that Ford has sufficiently alleged that Defendants gained access to confidential information by improper means.

Contrary to Defendants' assertions, the First Amended Complaint does contain specific allegations as to the who, what, how, when, and why sufficient to establish an act of misappropriation at this stage. For example, as to the "who," Ford specifically identifies Launch China, Launch USA, as well as specific Launch USA employees who purchased and activated Ford's IDS software (Xianglong Zu, Sam Shi, Sandy Lin, Jianke Wang, Eric W, Shi Shi, and Joe Li). *See* Dkt. # 16-18 (document explaining how PARSEALL.EXE accesses proprietary and confidential information stored in IDS authored by James Jiang, Launch China's Executive Vice President); Dkt. # 16, Pg ID 210; Dkt. # 16-8 (history of

purchases of Ford's IDS Software by "L aunch").  As to the "what" and the "how," Ford alleges that Defendants' created and used PARSEALL.EXE to extract data from Ford's IDS software and copy it onto products sold by Defendants, purchased and installed IDS, and agreed to and violated the terms of the EULAs prohibiting activation by diagnostic toolmakers as well as reverse engineering.  As to the "when," Ford alleges specific dates on which Defendants purchased and activated IDS.[23]  Additionally, Ford alleges that Launch China produced a file called Ford_99.H during the source code review, which specifically referred to "ids104" and "ids100,"  terms that allegedly refer to the specific versions of Ford's IDS software from which the files were obtained:  version 100 and 104 of Ford's IDS software released on April 13, 2016 and February 1, 2017 respectively. Lastly, as to the "why," Ford alleges that Defendants misappropriated its trade secrets in order to profit and directly compte with Ford's diagnostic products, as well as save time, effort, and money necessary to develop non-infringing diagnostic software.

Finally, Defendants' assertion that Ford has failed to allege acts of misappropriation that occurred after the enactment of the DTSA in 2016 is also contradicted by the First Amended Complaint.  Ford alleges that Defendants purchased and installed IDS, and agreed to and violated the terms of the EULAs in 2016 and 2017.  *See* Dkt. # 16-8.  Ford further alleges that Defendants improperly obtained version 104 of Ford's IDS software, which was released in 2017.

Construing the First Amended Complaint in the light most favorable to Ford and

---

[23]These purchases and activations occurred on 8/14/17, 12/01/16, 08/01/16, 01/14/16, 11/30/15, 10/15/16, 07/30/15, 12/01/14, 11/25/14, 10/14/14, 06/24/14, and 11/19/13.  *See* Dkt. # 16-8 (history of purchases of Ford's IDS Software by "L aunch").

drawing all reasonable inferences in favor of Ford, the Court concludes that Ford has adequately pled trade secret misappropriation, and that Defendants' arguments fail. Defendants' motions to dismiss Ford's misappropriation of trade secret claims are denied.

### 5.  Claim 8:  Copyright Infringement under 17 U.S.C. § 101, *et seq.*

Defendants argue that Ford's copyright infringement claim should be dismissed because it falls outside of the statute of limitations period and because Ford did not sufficiently allege that Defendants copied the compilation of data protected by Ford's CALID_VIDQID_REC copyright.

Ford responds that the claim is not barred under the statute of limitations, citing the doctrine of separate accrual.  Ford also argues that it has specifically alleged that Defendants copied the selection, coordination, and arrangement of facts protected by Ford's CALID_VIDQID_REC copyright.

The Copyright Act provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b).  A copyright claim accrues when an infringing act occurs.  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1969 (2014).  As the Supreme Court has explained,

> [i]t is widely recognized that the separate-accrual rule attends the copyright statute of limitations.  Under that rule, when a defendant commits successive violations, the statute of limitations runs separately from each violation.  Each time an infringing work is reproduced or distributed, the infringer commits a new wrong.  Each wrong gives rise to a discrete claim that accrues at the time the wrong occurs.  In short, each infringing act starts a new limitations period.

*Id.* (internal quotation marks and footnotes omitted).  However, an infringer is insulated from liability for earlier infringements of the same work that occurred more than three years

prior to the filing of the complaint. *Id.* at 1969-70.

Ford has alleged several infringing acts over the past years, most of them within the three years prior to the filing of this action. Ford alleges that Defendants acquired and activated multiple versions of Ford's IDS software containing Ford's copyrighted files in late 2014, 2015, 2016, and 2017. Ford also alleges that Launch China's source code refers to and includes files copied from versions 100 and 104 of Ford's IDS software released on April 13, 2016 and February 1, 2017 respectively. The Court finds that Ford's copyright infringement claim is timely.

To state a claim for copyright infringement, a plaintiff must allege facts establishing: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The first element tests the originality and non-functionality of the work and is presumptively established by the copyright registration, and the second element tests whether copying occurred and whether the portions of the work copied were entitled to copyright protection. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004). A plaintiff may show copying "either by direct evidence of copying, or by proof that Defendants had access to the copyrighted work and that the copyrighted work and the infringing work are substantially similar." *Wilcom Pty. Ltd. v. Endless Visions*, 128 F. Supp. 2d 1027, 1031 (E.D. Mich. 1998), *aff'd,* 229 F.3d 1155 (6th Cir. 2000) (internal quotation marks and citation omitted).

Contrary to Defendants' assertion, Ford has sufficiently alleged that Defendants copied the compilation of data protected by Ford's CALID_VIDQID_REC copyright. Defendants correctly note that, as to data compilations, only the selection, coordination,

and arrangement of facts are entitled to copyright protection.  *See Feist Publications*, 499 U.S. at 350-51.  That is precisely what Ford has alleged that Defendants' copied.  According to the First Amended Complaint, Defendants' FORD_02.BIN file, made available to Ford during the source code review, contains columns that *correspond to and are in the same order* as Ford's CALID_VIDQID_REC registration.  Ford also alleges that the CALID_VIDQID_REC file includes Column A7, which includes fictitious records and is not distributed by Ford, and that the *same* Column A7 with the *same* fictitious records is also found in Defendants' FORD_02.BIN.  Courts have noted that, in these types of cases, "the existence of common errors is one of the most persuasive proofs of copying, second only to direct evidence of copying."  *Hayden v. Chalfant Press, Inc.*, 281 F.2d 543, 548 (9th Cir. 1960).  Similarly, Defendants' EN_TEXT.TXT file, also made available during the source code review, contains at least three examples of idiosyncratic text present at the *same* frequency as in Ford's copyrighted MNEMONICS_ENG file.

Construing the First Amended Complaint in the light most favorable to Ford and drawing all reasonable inferences in favor of Ford, the Court concludes that Ford has adequately pled copyright infringement, and that Defendants' arguments fail.   Defendants' motions to dismiss Ford's copyright infringement claim are denied.

### 6.  Claim 9:  Breach of Contract

Launch China argues that Ford's breach of contract claim as to Launch China should be dismissed because (1) Ford merely alleges that an entity named "L aunch" with a California address accessed Ford's IDS software and breached the EULAs; (2) the EULAs do not define "diagnostic toolmaker;" and (3) the EULAs apply only to the defined "End-

User," which specifically excludes a diagnostic toolmaker such as Launch China.[24]

These arguments are not well taken. First, Ford has sufficiently alleged that Launch China and Launch USA acted in concert to hack Ford's IDS software. According to the First Amended Complaint, Defendants repeatedly inserted a space between the "L" and "a" in "L aunch" to ensure that Defendants would escape detection.

Second, the meaning of "diagnostic toolmaker" is readily ascertainable from the language of the EULAs, which provide that each EULA is an agreement "for the Ford Motor Company Integrated Diagnostic Software product," and that "[a]n End-User is defined as a repairer engaged in the direct repair of the vehicle. An End-user cannot be a diagnostic toolmaker." (Dkt. # 16-19, Pg ID 318). It is evident that "diagnostic toolmaker" refers to manufacturers and developers of diagnostic tools used in the repair of vehicles.[25] In any event, Launch China fails to present any developed argument as to why the failure to expressly define "diagnostic toolmaker" renders the EULAs unenforceable.[26]

Third, the Court rejects Launch China's argument that the EULAs do not apply to it because it is a "diagnostic toolmaker" specifically excluded from the definition of "End-

---

[24]Launch China correctly notes that it is not a signatory to the cease and desist letter identified in the First Amended Complaint. Only Launch USA signed the cease and desist letter. *See* Dkt. # 16-10, Pg ID 289. Ford does not address this point in its response to Launch China's Motion to Dismiss. Launch USA has not raised any argument specific to the cease and desist letter and the breach of contract claim.

[25]The paramount goal when interpreting a contract is to give effect to the intent of the contracting parties, and a court is to read an agreement as a whole and attempt to apply the plain language of the contract itself. *See Old Kent Bank v. Sobczak*, 243 Mich. App. 57, 63-64 (2000).

[26]Contracting parties are assumed to want their contract to be valid and enforceable. *See Cruz v. State Farm Mut. Auto. Ins. Co.*, 466 Mich. 588, 599 (2002).

User." As the Court reasoned in *Autel*, the EULAs prohibit diagnostic toolmakers form downloading IDS in the first place. They close the IDS's doors to diagnostic toolmakers such as Launch China. The EULAs do not, as Launch China's argument would suggest, offer competing diagnostic toolmakers free reign to access IDS. *See Autel*, 2016 WL 3569541, at *5.

Launch China's motion to dismiss Ford's breach of contract claim is denied.

For the reasons set forth above, Defendants' motions to dismiss for failure to state a claim are denied.

III. **Launch China's Emergency Motion to Stay Briefing in Response to Ford's Motions for Preliminary Injunction and Expedited Discovery**

Following a status conference on December 22, 2017, Magistrate Judge David R. Grand extended the briefing deadlines on Ford's pending Motion for Expedited Discovery and Order Compelling Production (Dkt. # 18). Following a status conference on January 3, 2018, this Court stayed the briefing deadlines on Ford's pending Motion for Preliminary Injunction (Dkt. # 17), indicating that it would first consider the threshold issues raised in Defendants' motions to dismiss. Accordingly, Launch China's motion to stay is now moot.

The Court having ruled on the threshold issues raised in Defendants' motions to dismiss, the following briefing deadlines will apply:

    A. Defendants' Response to Motion for Expedited Discovery is due on March 5, 2018.

    B. Plaintiffs' Reply in Support of Motion for Expedited Discovery is due on March 12, 2018.

    C. Defendants' Response to Motion for Preliminary Injunction is due on

March 30, 2018.

    D. Plaintiffs' Reply in Support of Motion for Preliminary Injunction is due on April 13, 2018.

    C. The hearing on Plaintiffs' Motion for Preliminary Injunction is rescheduled for May 9, 2018.

## IV. CONCLUSION

For the reasons set forth above, the Court hereby DENIES Launch China's motion to dismiss (Dkt. # 27) and DENIES Launch USA's motion to dismiss (Dkt. # 33).  It is further ordered that Launch China's motion to stay (Dkt. # 31) is MOOT, and that the following schedule will apply:

    A. Defendants' Response to Motion for Expedited Discovery is due on March 5, 2018.

    B. Plaintiffs' Reply in Support of Motion for Expedited Discovery is due on March 12, 2018.

    C. Defendants' Response to Motion for Preliminary Injunction is due on March 30, 2018.

    D. Plaintiffs' Reply in Support of Motion for Preliminary Injunction is due on April 13, 2018.

    C. The hearing on Plaintiffs' Motion for Preliminary Injunction is rescheduled for May 9, 2018.

SO ORDERED.

        s/Nancy G. Edmunds

Nancy G. Edmunds
United States District Judge

Dated: February 26, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 26, 2018, by electronic and/or ordinary mail.

s/Lisa Bartlett
Case Manager